92 F.3d 736
 65 USLW 2143
 Anne C. TROSTEL; Harry A. Holman, Jr.; H.L. Van Metre;
Charles H. Van Metre; Dorothy Hurley; Terrance
M. Hurly, Cmdr.; Carol Sabey, Mrs.;
Plaintiffs/Appellants,
Norwest Bank Fort Collins, N.A., Trustee/Appellant,
v.
AMERICAN LIFE & CASUALTY INSURANCE COMPANY, Defendant/Appellee,
Hawkeye Bank of Des Moines, Movant.
 No. 95-3666.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 10, 1996.
Decided Aug. 14, 1996.
 
 James M. Doran, Jr., Nashville, TN, argued (John E. Quinn, John R. Caldwell and Robert M. Holliday, on the brief), for appellants.
 A. Roger Witke, Des Moines, IA, argued (Richard J. Kirschman, on the brief), for appellee.
 Before BOWMAN, BEAM, and MURPHY, Circuit Judges.
 MURPHY, Circuit Judge.
 
 
 1
 This case involves a gold clause contained in a 99-year commercial property lease originally executed in 1917. American Life & Casualty Insurance Company is the current lessee, having acquired the leasehold interest in 1990. The lessors, successors in interest to the original lessor, brought this contract action against American Life after it refused to pay its monthly rent installments in gold coin as specified in the original lease. The district court granted summary judgment in favor of American Life on the basis that the gold clause had been erased from the 1917 lease by a 1933 act of Congress. We reverse and remand.
 
 
 2
 On June 27, 1917 John Trostel entered into a lease agreement with Morris and Jacob Joseph for commercial property in Des Moines, Iowa.[1] The second paragraph of the lease set the amount of annual rent at $12,000 for the first five years of the lease, $15,000 for the next 49 years, and $18,000 for the remaining 45 years. It also provided that "at the option of the lessor, all payments under this lease shall be made in gold coin of the United States of America, of or equal to the present standard of weight and fineness." In a separate paragraph, ninety days written notice was required as a condition precedent to the right of the lessor to demand payment in gold. Prior to the Depression era, gold clauses such as this were often included in long term rental agreements as a sort of price-indexing mechanism to protect a lessor from the effects of inflation. See Fay Corp. v. BAT Holdings I, Inc., 646 F.Supp. 946, 947 (W.D.Wash.1986), aff'd sub nom. Fay Corp. v. Frederick & Nelson Seattle, Inc., 896 F.2d 1227 (9th Cir.1990).
 
 
 3
 As part of the lease, the Josephs agreed to construct a building on the property that was at least eight stories in height. The lease gave the lessees the right to transfer or assign their interest in the lease, and provided that once the building was completed a proper assignment would relieve them of any further personal liability under the lease. A fourteen story building was completed on the property in 1931 and is now known as the Des Moines Building.
 
 
 4
 The lease was amended in writing four times, by supplemental agreements in 1921, 1927, and 1930 and by an amendment in 1959. It was also supplemented by a written Agency Agreement dated September 24, 1959.[2] Among other things, the amendments related to the building construction deadline, rent increases, and the appointment of an agent for the collection and receipt of rent.[3] Each of these amendments was recorded. None of these modifications referred to the gold clause in the original lease.
 
 
 5
 In 1933 Congress passed legislation which affected all gold clauses. A joint resolution of Congress declared gold clauses to be against public policy and provided that "dollar for dollar" payments in United States currency would discharge any obligation. Joint Resolution of June 5, 1933, 48 Stat. 112, 113 (1933) (formerly codified at 31 U.S.C. § 463) (codified as amended at 31 U.S.C. § 5118(d)(2)). This was one of a series of measures taken to stabilize the value of United States currency. See Norman v. Baltimore & O.R. Co., 294 U.S. 240, 295-97, 55 S.Ct. 407, 410-12, 79 L.Ed. 885 (1935). During the same period, private ownership of gold was banned and the dollar was devalued. See Rudolph v. Steinhardt, 721 F.2d 1324, 1325-26 (11th Cir.1983) (citing Kenneth W. Dam, From the Gold Clause Cases to the Gold Commission: A Half Century of American Monetary Law, 50 Chicago L.Rev. 504 (1983)).
 
 
 6
 Subsequently in 1975 Congress repealed the ban on private ownership of gold, and in 1977 it passed an amendment to the 1933 gold clause statute. The amendment provided that the provisions of the 1933 statute would not apply to obligations issued after October 27, 1977. Act of October 28, 1977, Pub.L. No. 95-147, § 4(c), 91 Stat. 1227, 1229 (codified as amended at 31 U.S.C. § 5118(d)(2)).[4] In other words, as of October 28, 1977, it was once again legal to contract for payment in gold.
 
 
 7
 The interest in the Des Moines Building lease has been transferred numerous times, and three of the transfers are considered relevant by the parties. On May 7, 1969, State Automobile and Casualty Underwriters (State Auto) acquired the leasehold estate pursuant to a Warranty Assignment and Assumption. In this document, State Auto agreed to be bound by all of the terms and conditions of the 1917 lease, as amended by specific written and recorded amendments. The parties agree that this transfer of interest was a novation that created a valid contract between lessors and State Auto and that released the prior lessee from any obligation.
 
 
 8
 On December 20, 1985, State Auto transferred the leasehold interest to The Statesman Group, Inc. (Statesman), which later transferred it to American Life on August 15, 1990.[5] The 1985 and 1990 transfers were each accomplished pursuant to a recorded Warranty Assignment and Assumption (warranty agreement) similar to that used in the 1969 transaction.
 
 
 9
 The 1990 warranty agreement, which is the basis of the current lease, specifically incorporated the terms of the 1917 lease. It provided that Statesman:
 
 
 10
 does hereby sell, transfer, assign and setover unto [American Life] the leasehold estate more particularly described in that certain lease dated June 27, 1917, and recorded in the office of the Recorder of Polk County, Iowa, on April 25, 1923, in Book 870, Page 497, wherein Joseph (sic) and Jacob Joseph are the Lessees; as amended by Supplemental Agreement dated May 6, 1921, recorded in the office of said County Recorder on April 25, 1923, in Book 870, Page 501; as further amended by Supplemental Agreement dated July 20, 1927, in Book 1011, Page 239; as further amended by Supplemental Agreement dated may 31, 1930, in Book 1107, Page 291; and as further amended by Amendment to Lease dated September 1, 1959, recorded in the office of said County Recorder on October 2, 1959, in Book 3190, Page 331; and as further supplemented by Agency Agreement dated September 24, 1959, recorded in the office of said County Recorder on January 4, 1963, in Book 3476, Page 476....
 
 
 11
 Statesman also warranted that the lease "has not been cancelled, surrendered or modified except pursuant to those supplements above specified and that said Lease is in full force and effect." The document also provided that American Life as grantee:
 
 
 12
 hereby accepts, assumes and agrees to be bound by all of the terms and conditions to be kept, observed and performed by the lessee in said lease, as amended above described, from and after August 1, 1990....
 
 
 13
 In a letter dated December 27, 1993, an attorney for the lessors demanded payment of the rental obligation from American Life in gold coin pursuant to paragraph two of the 1917 lease.[6] On March 25, 1994 American Life delivered a cashier's check in the amount of $515,583.33 to the agent, along with a letter explaining that it represented the total rental obligation for the remaining lease term through the year 2016.[7] The letter claimed that the payment to the agent constituted a complete discharge of all rent owing. Although the 1917 lease required that rent be paid monthly in advance, American Life claims that requirement is superseded by language in the 1959 amendment related to the appointment of an agent for rent collection.
 
 
 14
 The lessors' attorney instructed the agent to hold the check for a week, after which he advised that the tender had been refused and instructed the agent to return the check to American Life. American Life has refused to accept the check back, and no rent has exchanged hands since that time.
 
 
 15
 The lessors filed this case against American Life on July 29, 1994, claiming that it had breached the lease contract by failing to make payments in monthly installments and in gold coin. They believe that the 1990 transfer of the leasehold interest to American Life was a new obligation entered into after the 1977 amendment which once again permitted requirements of payment in gold. In their view the gold clause in the 1917 lease was revived by the terms of the 1990 warranty agreement. American Life argued that the gold clause was not part of the current lease and that its prepayment of rent for the remainder of the lease term satisfied its rental obligation.
 
 
 16
 The district court granted summary judgment for American Life and dismissed the action. It held that even if a new obligation had been created in 1990, the gold clause could not have been incorporated in it by reference to the terms of the 1917 lease because the 1933 act had rendered that clause void and erased it from the 1917 lease. The lessors appealed, arguing that the gold clause had not been erased from the 1917 lease, that it was revived by what they refer to as a novation in 1990, and that American Life breached the lease by refusing to pay in gold coin and by failing to make rental payments in monthly installments. American Life responds that the gold clause was erased from the original lease by the act of Congress. It also claims that the gold clause was severed from the lease by a novation in 1969, that the current lease between lessors and American Life does not contain a gold clause because the 1990 transfer was not a novation, and that its prepayment of rent for the remainder of the 99 year term satisfied its rental obligation. It alternatively argues that if the gold clause is enforceable, the amount due should be based on the value of gold in 1990 rather than in 1917.
 
 
 17
 The issue we must determine is whether the current obligations between the parties include the gold clause contained in paragraph two of the 1917 lease. American Life's obligations under the lease were created by the 1990 warranty agreement between it and Statesman. On its face the warranty agreement incorporates all of the terms of the 1917 lease. That lease included the gold clause, of course, which was not specifically mentioned in 1990 as being relevant or not.
 
 
 18
 If the 1990 transfer of interest created a new obligation between lessors and American Life, it could legally contain a gold clause because it took place after the time that gold clauses were prohibited. See 31 U.S.C. § 5118(d)(2); Fay Corp. v. BAT Holdings I, Inc., 646 F.Supp. 946, 952 (W.D.Wash.1986), aff'd sub nom. Fay Corp. v. Frederick & Nelson Seattle, Inc., 896 F.2d 1227 (9th Cir.1990) (gold clause in 99-year lease entered into in 1929 revived by post-1977 novation of contract); Wells Fargo Bank v. Bank of America, 32 Cal.App.4th 424, 38 Cal.Rptr.2d 521, 529 (1995) (same). The 1990 transfer of interest would create such a new obligation if it constituted a novation of the lease. See Fay Corp., 646 F.Supp. at 952; Wells Fargo Bank, 38 Cal.Rptr.2d at 529.
 
 
 19
 American Life states in its briefs that the 1990 transaction was not a novation, but it does not dispute that a valid new obligation was formed. Instead it argues that the new obligation did not contain a gold clause. Iowa law describes a novation as "a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." Klipp v. Iowa Grain Indem. Fund Bd., 502 N.W.2d 9, 11 (Iowa 1993) (quoting Restatement (Second) of Contracts § 280 (1981)). To prove a novation under Iowa law, a proponent must show four elements: 1) a previous valid obligation; 2) agreement of all parties to a new contract; 3) extinguishment of the existing contract; and 4) validity of the new agreement. Id.
 
 
 20
 In this case there is no question that a valid previous lease obligation existed between Statesman and the lessors, that all parties agreed to a new contract,[8] that the obligations of Statesman were extinguished, and that a valid lease was created between lessors and American Life. American Life asserts that there was no novation as to the gold clause itself because the parties did not intend to incorporate it into the new lease. That argument involves how to interpret the terms of the existing contract, not whether a novation took place.[9] American Life does not suggest that the 1990 transaction was anything other than a novation.
 
 
 21
 We conclude that under Iowa law the 1990 transfer of interest was a novation and that the parties were legally free to incorporate a gold clause into the lease agreement at that time. See 31 U.S.C. § 5118(d)(2); Fay Corp., 646 F.Supp. at 952; Wells Fargo Bank, 38 Cal.Rptr.2d at 529. That does not end the inquiry, however, because the parties did not explicitly mention gold or specifically identify each lease term. Rather, the 1990 warranty agreement simply incorporated all the terms and conditions in the 1917 agreement, and that lease had a gold clause. American Life argues that the gold clause had been severed from the original lease by the 1933 act of Congress and that it was therefore no longer part of the 1917 lease terms.
 
 
 22
 The 1933 act provided that an existing (or future) obligation requiring payment in gold coin was dischargeable by payment in dollars. The parties disagree as to the effect of this statute on the gold clause in the 1917 lease. American Life says the statute amended the lease as a matter of law by removing the gold clause, but the lessors respond that the statute only made the clause unenforceable.
 
 
 23
 There is no question that between 1933 and 1977 the lessors could not successfully have demanded payment in gold coin from any lessee, but they claim that the 1917 clause was readopted by the 1990 warranty agreement and became effective pursuant to the 1977 statutory amendment. American Life admits that the 1933 act would not have prohibited the parties from contracting for a gold clause in 1990, but argues that the terms of the 1917 lease were permanently altered by the operation of the 1933 act, which had "erased" the gold clause from the 1917 lease.
 
 
 24
 Nothing in the terms of the 1933 act suggests that an existing gold clause would be "erased" or eliminated from the lease. Congress declared "any obligation which purports to give the obligee a right to require payment in gold" to be "against public policy" and stated that "no such provision shall be contained in or made with respect to any obligation hereafter incurred." Joint Resolution of June 5, 1933, Ch. 48, 48 Stat. 112, 113 (1933) (originally codified at 31 U.S.C. § 463) (currently codified as amended at 31 U.S.C. § 5118(d)(2)).[10] The 1933 act did not direct that existing gold clauses were to be severed from existing contracts, but instead rendered them unenforceable: it stated that every obligation, whenever it was incurred and whether or not it had a gold clause, was dischargeable upon payment in United States currency. See Norman v. Baltimore & O.R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935) (upholding 1933 act as valid exercise of Congressional power to establish a monetary system and determining that enforcement of gold clauses was incompatible with public interest).
 
 
 25
 The idea that the gold clause disappeared from the original lease is not supported by the specific text of the statute, which contemplates that contracts might continue to contain gold clauses by referring to "every obligation heretofore or hereafter incurred." Moreover, the text of the 1977 amendment refers to obligations "containing" gold clauses.
 
 
 26
 American Life relies on cases stating broad principles such as "contract provisions that are contrary to public policy are void" to suggest that the 1933 statute operated to erase existing gold clauses. See, e.g., McBrearty v. United States Taxpayers Union, 668 F.2d 450, 451 (8th Cir.1982) (agreements contravening public policy are void); In re NWFX, Inc., 881 F.2d 530, 538 (8th Cir.1989). The cases cited do not support its claim that existing gold clauses were rendered unrevivable by the 1933 act. None of the cases involve the incorporation of a once prohibited clause into a new contract by reference to an original document containing it.
 
 
 27
 The 1933 act did not magically erase the gold clause from the 1917 lease. Although it rendered the clause unenforceable, there is no reason that it could not be incorporated by reference in a new lease obligation entered into in 1990. See Fay Corp., 646 F. Supp. at 952; Wells Fargo Bank v. Bank of America, 38 Cal.Rptr.2d at 529.
 
 
 28
 American Life suggests that even if the clause were not voided in 1933, the 1969 transfer of the leasehold interest to State Auto severed the clause from the original lease. It claims that transaction was a novation that took place during the time that gold clauses were banned, but does not explain why that would delete the clause from the original lease or prevent later adoption of the original clause. The gold clause would of course not have been enforceable against State Auto because its obligation was entered into prior to the 1977 amendment. When it transferred the leasehold to Statesman in 1985, however, it did not purport to transfer its own obligations, but instead described the leasehold by the terms of the original lease. Similarly, the transfer of interest from Statesman to American Life in 1990 referred to the terms and conditions of the 1917 lease.
 
 
 29
 The 1917 lease contained an explicit gold clause, and neither the 1933 act nor the 1969 novation prevented its incorporation by reference into the terms of the new lease in 1990. The gold clause was valid at the time the original lease was executed, and although it was rendered unenforceable after 1933, it remained a written term of the lease as recorded and amended. The leasehold interest was transferred to American Life after the prohibition on gold clauses had been set aside by Congress, and the transfer specifically referred to the obligations described in the 1917 lease and its written amendments. Nothing in the 1990 warranty agreement indicated that American Life accepted only those obligations that had been legally enforceable against all previous lessees. Instead it specifically agreed to be bound by the obligations described in the 1917 lease and its written amendments.
 
 
 30
 American Life also suggests that the existing obligation between it and the lessors does not contain a gold clause because the parties did not intend to include a gold clause as a contract term in 1990. It claims that there is extrinsic evidence that the parties did not reach a meeting of the minds about incorporating a gold clause into the contract in 1990. That evidence includes affidavits to the effect that American Life did not intend to assume an obligation to pay rent in gold, as well as the fact that the lessors became aware that gold clauses could legally be incorporated into new agreements in 1991.
 
 
 31
 When construing a written contract under Iowa law, the intent of the parties controls, and unless there is ambiguity, intent is determined by what the contract itself says. See Howard v. Schildberg Constr. Co., 528 N.W.2d 550, 554 (Iowa 1995); Anderson v. Aspelmeier, Fisch, Power, Warner & Engberg, 461 N.W.2d 598, 600 (Iowa 1990). The language of the 1990 warranty agreement is not ambiguous. American Life agreed to be bound by the terms of the 1917 lease as recorded and as amended by the specified recorded amendments. The intent of American Life to be bound by these terms, which included an explicit gold clause, is expressed in clear and unambiguous language, and the contract thus should be enforced as written. See Howard, 528 N.W.2d at 554.
 
 
 32
 American Life also claims that its advance payment of rent on the remaining years of the lease satisfied its obligations. The 1917 lease required that the rent be paid to the lessor monthly in advance. American Life concedes that such a provision generally precludes a lessee's right to prepay rent, but claims that the 1959 amendment to the lease superseded it and allowed prepayment.
 
 
 33
 The 1959 amendment was made to "simplify and clarify the arrangements as to payment of rent, the handling of insurance policies, the deposit of evidences of payment of taxes and other items, the designation of Agents, the giving of Notices, and the treatment of Lessee's option to purchase the fee title to the real estate." It made specific changes to several paragraphs of the original lease including paragraph 31, which had been added by amendment in 1930. Paragraph 31 provided that an agent would be appointed, that its duties were to be "essentially ministerial," and would "include the collection and receipt of rents under said lease." The amendment provided that delivery to the agent "of checks, money, notices, documents, written information, and the like," would "constitute delivery thereof to Lessee or Lessors." It further stated:
 
 
 34
 The payment of rent by the Lessee to such an Agent shall constitute a complete discharge of the rent so paid, and the Lessee shall not be required to take notice of the termination of any such Agent's authority or the appointment of a successor unless notified in writing thereof in the manner in this lease provided for the service of notices.
 
 
 35
 American Life argues that the 1959 amendment removed the requirement that rent must be paid monthly or at least creates an ambiguity whether it must. By its terms, however, the 1959 amendment relates only to whom the rent should be paid, and does not imply that the amount or timing of the payment would be affected. The contract as amended is unambiguous that the rent must be paid to the agent monthly in advance. American Life could not fulfill its obligations under the contract by prepaying the rent for the remainder of the term.
 
 
 36
 The parties also disagree on the proper value of any gold payment required. American Life claims the requirement of payment in gold "of present weight and fineness" would refer to the value in 1990, rather than in 1917. The lessors believe that the value of gold in 1917 was intended. The district court did not consider this issue because it held that the gold clause could not have been revived as a matter of law. Since the term relating to "present weight and fineness" is ambiguous, resolution of the issue will involve a factual inquiry. It should therefore be addressed in the first instance by the district court.
 
 
 37
 For the stated reasons, the judgment is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 The leased property was described as:
 Lot Four (4) and the West one-third (W. 1/3) of Lot Three (3) in Block "C" of Commissioner's Addition to the City of Des Moines, now within the corporate limits of the City of Des Moines, Iowa.
 
 
 [2]
 The amendment in 1959 related to the adoption of this Agency Agreement
 
 
 [3]
 In May 1921 the deadline was extended for the construction of the building on the property. In July 1927 a further extension was added, but it was agreed that the rent would increase each year that the building was not completed after the amended deadline. A 1930 amendment provided that the new lessee would construct a 14 story building on the property and the rent would increase upon its construction, and appointed an agent for the collection and receipt of rent. In 1959 the rights of the parties regarding rent payment, insurance, and notice were simplified and clarified
 
 
 [4]
 The 1977 amendment was originally codified at 31 U.S.C. § 463 (note), but in 1982 it was recodified at § 5118(d)(2) with only nonsubstantive changes. The statute currently provides:
 An obligation issued containing a gold clause or governed by a gold clause is discharged on payment (dollar-for-dollar) in United States coin or currency that is legal tender at the time of payment. This paragraph does not apply to an obligation issued after October 27, 1977.
 
 
 [5]
 State Auto, The Statesman Group, and American Life are related corporate entities. At the time of the 1969 lease transfer, The Statesman Group controlled State Auto by owning 100% of the stock of its attorney-in-fact, Automobile Underwriters Corporation. At the time of the lease transfer to American Life in 1990, the Statesman Group directly owned and controlled 100% of American Life stock
 
 
 [6]
 The attorney at that time represented parties holding 2/3 of the lessors' interests. He repeated the demand on March 29, 1994 on behalf of the lessors holding the remaining 1/3 interest
 
 
 [7]
 American Life was apparently attempting to avoid the operation of the gold clause by paying off the lease within ninety days of receiving notice. The 1917 lease required that the lessor give ninety days notice of its demand for payment in gold. Because notice was given December 27, 1993, the required payment in gold would start in April 1994
 
 
 [8]
 The lessors' agreement to the novation arises from a clause in the 1917 lease which provided that the lessee could transfer the leasehold and that upon such transfer the lessee would be released from any personal liability. There is no claim here that the prior consent was invalid
 
 
 [9]
 Specifically, American Life claims there was no novation of the gold clause because the previous obligation between Statesman Group and lessors did not contain a gold clause. Even if the previous lease did not incorporate the gold clause, the terms of the new lease created by the novation are not limited to those in the previous lease. See Restatement (Second) of Contracts § 280 cmt. a (1981). American Life also claims that there was no meeting of the minds about whether to include a gold clause, but the explicit terms of the contract unambiguously suggest otherwise
 
 
 [10]
 The relevant portions of the Act state:
 Resolved by the Senate and House of Representatives of the United States of America and Congress assembled, That (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or particular kind of gold or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy and no such provision shall be contained in or made with respect to any obligation hereafter incurred.... Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar-for-dollar, in any coin or currency which at the time of payment is legal tender for public and private debts....
 Joint Resolution of June 5, 1933, Ch. 48, 48 Stat. 112, 113 (1933) (originally codified at 31 U.S.C. § 463) (currently codified as amended at 31 U.S.C. § 5118(d)(2)).