# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2999

_____

Anne C. Trostel; Harry A. Holman,     *
Jr.; H. L. Van Metre; Charles H. Van     *
Metre; Dorothy Hurley; Terrance M.     *
Hurley, Cmdr; Mrs. Carol Sabey,     *
    *
       Plaintiffs - Appellees,     *
    *   Appeal from the United States
      v.     *   District Court for the
    *   Southern District of Iowa.
American Life & Casualty     *
Insurance Company,     *
    *
       Defendant - Appellant.     *

_____

Submitted: January 13, 1999
Filed: February 23, 1999

_____

Before BOWMAN, Chief Judge, WOLLMAN and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

This case, now before us for the third time, involves an anti-inflationary gold clause in a lease for commercial property in downtown Des Moines. The lease was originally entered into in 1917, and the significance of its gold clause has been impacted over the years by changes in federal policy and statutory law. See Trostel v. American Life & Cas. Ins. Co., 92 F.3d 736 (8th Cir. 1996) (Trostel I), vacated,

117 S. Ct. 939 (1997); <u>Trostel v. American Life & Cas. Ins. Co.</u>, 133 F.3d 679 (8th Cir.) (<u>Trostel II</u>) (reinstating <u>Trostel I</u>), <u>cert. denied</u>, 118 S. Ct. 2359 (1998). The appellees are heirs of the original lessor, and in <u>Trostel I</u> we held that appellant American Life & Casualty Insurance Company (American) had assumed all the obligations in the original lease, including those related to the gold clause, when it became the lessee under a 1990 assignment agreement. <u>See</u> <u>Trostel I</u>, 92 F.3d at 740–41; <u>see also</u> <u>Trostel II</u>, 133 F.3d at 680, 682. Since appellees had exercised their option to demand that lease payments be made under the gold clause and the parties disagreed on the standard of gold to use in calculating the amount due, the case was remanded to the district court[1] to make that determination. <u>See</u> <u>Trostel I</u>, 92 F.3d at 743. It ruled that the 1917 standard for gold should be used to calculate the amount of lease payments rather than the 1990 standard and that a 1997 transaction entered into by American did not affect its obligations under the lease. On its appeal American challenges both decisions. We affirm.

I.

In 1917 John Trostel entered into a ninety-nine year lease agreement with Morris and Jacob Joseph. <u>Trostel I</u>, 92 F.3d at 737–38. The lease provided that "at the option of the lessor, all payments under this lease shall be made in gold coin of the United States of America, of or equal to the present standard of weight and fineness." <u>Id.</u> at 738.[2] Prior to the Depression, long-term leases often included gold clauses such as this to protect the lessor against inflation. <u>Id.</u> (citing <u>Fay Corp. v. BAT Holdings I, Inc.</u>, 646 F. Supp. 946, 947 (W.D. Wash. 1986), <u>aff'd sub nom.</u> <u>Fay</u>

---

[1]The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

[2]More details about the lease and its background can be found in <u>Trostel I</u> and <u>Trostel II</u>.

Corp. v. Frederick & Nelson Seattle, Inc., 896 F.2d 1227 (9th Cir. 1990)).  The lease gave the lessees the right to transfer or assign the lease.  Id.

Congressional policy regarding gold clauses has shifted over time.  In a 1933 joint resolution, Congress declared gold clauses to be against public policy and provided that "dollar for dollar" payments in United States currency would discharge any obligation.  Id. (citing Joint Resolution of June 5, 1933, 48 Stat. 112, 113 (1933) (codified as amended at 31 U.S.C. § 5118(d)(2))).  Congress reversed course in 1977 and amended the 1933 legislation so that it would not apply to obligations issued after October 27, 1977.  Id. (citing Act of October 28, 1977, Pub. L. No. 95-147, § 4(c), 91 Stat. 1227, 1229 (codified as amended at 31 U.S.C. § 5118(d)(2))).  This 1977 amendment allowed gold clauses to be once again enforceable when part of a new obligation.

American became the lessee of the property in 1990 pursuant to a recorded Warranty Assignment and Assumption (warranty agreement).  Id. at 739.  The warranty agreement provided that American "accepts, assumes and agrees to be bound by all of the terms and conditions to be kept, observed and performed by the lessee in [the 1917 lease]."  Id.  In 1993, the lessors demanded payment of the rental obligation from American in gold coin.  Id.  When American refused to accede to the demand, the lessors sought a declaratory judgment to enforce it.  See Trostel II, 133 F.3d at 680.  We held in Trostel I that the 1990 warranty agreement was a novation in which American had assumed all obligations of the original lease.  The gold clause was enforceable because under Iowa law the novation amounted to a new obligation and it was incurred after the 1977 amendment to the federal statute.  Id. at 680, 682 (citing Trostel I, 92 F.3d at 740–41; Klipp v. Iowa Grain Indemnity Fund Board, 502 N.W.2d 9, 11 (Iowa 1993); Eitzen's Estate v. Lauman, 3 N.W.2d 546, 549–50 (Iowa 1942)).

This court remanded to the district court for further proceedings, but the parties meanwhile became engaged in efforts to seek Supreme Court review and Congressional action to advance their positions. While American's petition for certiorari was pending, it succeeded in obtaining an amendment to 31 U.S.C. § 5118(d)(2) (the gold clause statute) in 1996. The amendment was inserted in the Economic Growth and Regulatory Paperwork Reduction Act of 1996, and it provided that no obligation assumed after October 27, 1977 involving a gold clause in a pre-existing lease would be enforceable unless all parties "specifically agree[d] to include a gold clause in the new [post-October 27, 1977] agreement." Id. at 680. After the passage of this legislation, the Supreme Court granted certiorari, vacated Trostel I, and remanded the case to this court "for further consideration in light of the [1996 amendment]." Id. (quoting 117 S. Ct. 939 (1997)). Appellees also sought legislative action and in 1997, prior to oral argument on the remanded case, Congress proceeded to eliminate the provision it had added to the gold clause statute in 1996. Id. at 681. The parties disagreed about whether this amendment had retroactive effect. See id. We held that even if the 1997 amendment had only prospective effect and the 1996 amendment controlled here, the gold clause was still enforceable because American had explicitly agreed to be bound by the terms of the 1917 lease. Id. at 681–82. Trostel I was therefore reinstated, and the case remanded to the district court for it to resolve the dispute about the proper value of gold to be used in calculating the lease payments. The Supreme Court declined to review Trostel II. 118 S. Ct. 2359 (1998).

II.

The case returned to the district court for it to determine how much the lessors were entitled to be paid under their exercise of the gold option. The lease terms entitle them to be paid in gold coin "of or equal to the present standard of weight and fineness." Although the parties agree on the value of gold in the relevant years, they disagree about whether "present standard" means the value of gold at the time of the original lease in 1917 or at the time of the novation in 1990. They agree that the

-4-

monthly lease payment should be 92.72 Troy ounces of fine gold using the 1917 value and 4.81 Troy ounces using the 1990 value.[3]

Appellees initiated the proceedings by filing motions for Entry of Order in Accordance with the Opinion of the Eighth Circuit and for summary judgment. Both sides relied on evidence already in the record to make their arguments. Appellees argued that the intent of the parties in 1917 governed; although no one with actual knowledge of that intent was still living, the historical context indicated that the gold clause was intended as a price indexing mechanism. Appellant argued that the intent of the parties to the novation in 1990 governed; although American had formed no specific intent in 1990 regarding the gold clause, it would have been irrational to have intended the 1917 value of gold to apply.

Appellant also presented an additional issue to the district court based on a 1997 transaction between it and another company. American had transferred its leasehold interest to its sister corporation, the Vulcan Life Insurance Company (Vulcan) on March 17, 1997. This transfer involved a Warranty Assignment and Assumption agreement that was substantively identical to the 1990 warranty agreement except that it "expressly disclaim[ed] any intent to sell, transfer, assign, setover or otherwise comply with" the gold clause. American argued that it was therefore no longer bound by the gold clause. The lessors argued that the transaction did not affect American's obligation under their lease.

---

[3]Translation into dollars depends upon the value of each Troy ounce of fine gold. Assuming for purposes of illustration that that value were $400, the annual lease payment would amount to $445,056 under the 1917 standard or $23,088 under the 1990 standard. Similarly, the value of the arrearages awarded by the district court, 5928.66 Troy ounces of fine gold, would vary from $2,371,464 to $123,024 depending upon the standard.

The district court granted summary judgment to the lessors on July 1, 1998, and judgment was entered on that date. The district court concluded that there was no evidence of the intent of the parties in either 1917 or 1990, but that the historical use of gold clauses for price indexing leads to the conclusion that the 1917 value of gold should apply. The district court also held that the 1997 warranty agreement did not relieve American of its obligations under the gold clause because it could not unilaterally modify the terms of the lease. The district court ordered American to pay the lessors arrearages, including interest through June 30, 1998, in the amount of 5928.66 Troy ounces of fine gold, and to pay future monthly lease payments of 92.72 Troy ounces of fine gold.

## III.

On its appeal, American contends that the district court erred in granting summary judgment to the lessors. It believes that the 1990 value of gold is the appropriate measure and that its agreement with Vulcan in 1997 eliminated the gold clause from the lease. Our review of the district court's grant of summary judgment is de novo. See St. Paul Fire & Marine Ins. Co. v. Schrum, 149 F.3d 878, 880 (8th Cir. 1998).

American argues that the 1990 value of gold should control the rent calculation because it would have been irrational for it to have intended the 1917 standard to apply when it assumed its obligations under the 1990 novation. We have previously rejected American's theory that it did not intend to include a gold clause at the time of the 1990 novation because "the explicit terms of the [1990 novation] unambiguously suggest[ed] otherwise." Trostel I, 92 F.3d at 741 n.9; see id. at 742–43. The 1990 novation did not create a new gold clause, but rather incorporated the gold clause from the 1917 lease. See id. at 741–43. In 1990, American undertook all obligations of the original lessees, and the intent of the parties to the 1917 lease therefore governs the interpretation of the meaning of "present standard" in the gold

clause.  Cf. Gendler Stone Prods. Co. v. Laub, 179 N.W.2d 628, 631 (Iowa 1970) ("conduct of the assignees is of no value in determining the intention of the original makers").

There is no direct evidence in the record of the intent of the parties in 1917, but both the language and purpose of such a gold clause support using the 1917 value of gold to calculate the lease payments at issue.  The gold clause, if exercised, calls for payment in gold "of or equal to the present standard of weight and fineness." "Present" implies an existing standard, and the 1917 parties could have used other language if they had intended "present standard" to be a shifting standard (such as "the then applicable standard").  Moreover, there is no dispute that the purpose of gold clauses is to protect a lessor against inflation.  This protection would be meaningless if the baseline value of gold were revised anytime the lessee transferred the leasehold interest to a new obligor.  The only way for the gold clause to serve its function to protect the lessors against inflation is to use the 1917 value of gold.  Since the obligation American incurred in 1990 was to assume the duties of the 1917 lease, including its gold clause, it follows that the 1917 value of gold should be used to calculate the lease payments.

American argues that the gold clause was eliminated from the lease in 1997 when it attempted to assign its rights and delegate its duties under the lease to its sister corporation and they expressly agreed to disclaim the gold clause.  By this transaction involving only the lessee side of the ledger, they sought to affect the rights of the lessors — those on the other side of the lease.  But, "one party to a contract cannot alter its terms unilaterally or without assent of the other party." Davenport Osteopathic Hosp. Assoc. v. Hospital Serv., Inc., 154 N.W.2d 153, 157 (Iowa 1967). Under the logic of American's theory, it could have expressly disclaimed any intent to transfer the obligation to pay rent, thereby eliminating the rental obligation from the lease.  The expressed intent not to transfer the gold clause meant that Vulcan did not assume it, but that did not eliminate the gold clause from the contract.  Since the

parties to the 1997 agreement did not intend to transfer the gold clause to Vulcan, American remains obligated under it.

IV.

In summary, we conclude that the district court did not err in granting summary judgment to the lessors. The judgment of the district court is therefore affirmed.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.