FOURTH DIVISION

MARCH 21, 2002

1-01-1309

NEBEL, INC., an Illinois corporation, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County.

)

v. ) 

)

THE MID-CITY NATIONAL BANK OF CHICAGO, )

a National Banking Association, ) Honorable

) Lester D. Foreman,

Defendant-Appellee. ) Judge Presiding.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff, Nebel, Inc., and defendant, The Mid-City National Bank of Chicago, are the lessor and lessee under a 99-year real-estate lease (Lease), containing a rent payable in gold clause, originally executed in 1906.  Plaintiff demanded rental payments to be made with gold coins, pursuant to the Lease, which defendant refused.  In a three-count complaint, plaintiff charged defendant with a breach of the lease (count I); sought a declaration of rights (count II); and subsequently voluntarily dismissed count III.  Plaintiff claimed that a 1988 amendment to the Lease (Lease Amendment) constituted a new obligation which revived the gold clause, as authorized by a 1977 federal statute and, alternatively, asserted that if the Lease Amendment was not a new obligation, a novation occurred which revived the enforceability of the gold clause.  Defendant's answer denied both theories.

Plaintiff's motion for partial summary judgment was denied by the circuit court.  Thereafter, the parties cross-moved for summary judgment on counts I and II of plaintiff's complaint.  The court granted defendant's summary judgment motion with respect to counts I and II and denied plaintiff's motion on the same counts.  Plaintiff appeals.  

The legal issues presented in this appeal include whether the circuit court erred by granting defendant's summary judgment motion based on a finding that (1) the Lease Amendment did not create a new obligation, thereby making the gold clause in the Lease unenforceable; and (2) no novation between the parties, to be construed as a new obligation, occurred.

On May 1, 1906, Hiram B. Peabody, as lessor, and Alexander W. Hannah, as lessee, entered into the subject Lease for land and improvements located at 801 West Madison Street in Chicago (subject premises).  The Lease term commenced on May 1, 1906, and terminates on April 30, 2005.  Monthly rent for the subject premises during the first five years was $1,090 and, thereafter, $1,333.33 and 1/3 cents, until expiration of the Lease term.  

As previously noted, the Lease includes a gold clause, requiring the lessee to pay the rent "in standard gold coin of the United States, of not less than the present weight and fineness, which is at the present time measured by the standard of weight and fineness observed by the mint and fixed by the laws of the United States of America, twenty three and twenty-two hundredths (23-22/100) grains Troy weight for each dollar."  The Lease covenants that "no acceptance by the said lessor of any currency or legal tender *** shall be construed to be a waiver on the part of the said lessor of the right to demand payment of any other unpaid installment or installments of such rent in standard gold coin *** or its equivalent in value."  

On June 5, 1933, the United States Congress adopted a joint resolution that made unenforceable all obligations requiring payment in gold;
(footnote: 1) however, in 1977, the 1933 Congressional resolution was amended making obligations requiring payment in gold enforceable if issued after October 27, 1977.
(footnote: 2) 

The Lease also requires that the lessee pay for all real estate taxes, insurance and repairs, and expressly grants the lessee the right to assign his or her interest in the Lease without the lessor's consent.  No language contained in the Lease discharges a lessee from his or her obligations under the Lease subsequent to an assignment; rather, upon assignment, the assignee agrees to comply with all terms, covenants and agreements provided for in the Lease. 

During the Lease term, the lessee's interest had been assigned four times.  First, on December 31, 1909, Hannah assigned his interest in the Lease to Charles E. Davis.  Next, on March 1, 1911, Davis assigned his interest to Jacob Mayer.  Then, on October 26, 1926, Mayer assigned his interest to Chicago Mid-City Building Corporation (Building Corporation).
(footnote: 3)  Thereafter, on December 30, 1976, Building Corporation assigned its interest to defendant.   Defendant, Building Corporation's sole shareholder, voted to dissolve Building Corporation on the same date defendant assumed liability as lessee of the Lease.
(footnote: 4)  The 1976 assignment provided that defendant agreed to comply with all Lease terms, covenants and agreements, but did not articulate language regarding Building Corporation's liability under the Lease.
(footnote: 5)  Defendant is the current lessee of the subject premises. 

On July 5, 1984, plaintiff purchased the subject premises and became the lessor.  By deposition, Peter Anagnost, an attorney and managing agent for plaintiff, testified that he personally negotiated the purchase price of $300,000 for the property, believing the rent payments were $16,000 per year.  The gold clause in the Lease was not discussed during negotiations. 

Upon effectuating the purchase of the subject premises, Anagnost believed that Building Corporation was the lessee.  He received a "lease synopsis" from The Northern Trust Company (Northern Trust), successor trustee of the Howard B. Peabody Trust, which stated that Building Corporation was the current assignee of the tenant's interest in the Lease.
(footnote: 6)  Anagnost had no knowledge of the 1976 Lease assignment to defendant nor Building Corporation's dissolution at the time of purchase.
(footnote: 7)
 By deposition, Kenneth A. Skopec, defendant's vice-chairman and chief executive officer, testified that Anagnost did not inquire as to whether Building Corporation was the actual tenant for the subject premises.  Skopec stated that defendant did not notify plaintiff about the 1976 Lease Assignment nor Building Corporation's dissolution.  Upon plaintiff's purchase of the subject premises, defendant, not Building Corporation, paid rent to plaintiff. 

In 1988, defendant undertook a plan to construct a parking lot and data processing/drive-thru banking facility on property west of the subject premises.  Defendant also sought to construct a pedestrian walkway to connect the bank building on the subject premises with the new data processing/drive-thru facility.  Plaintiff, however, objected to the construction of the walkway without its consent.

Plaintiff's former counsel, George C. Pontikes, testified that he drafted a Lease Amendment that would permit defendant to construct the walkway.  The Lease Amendment authorized:  (1) construction of the walkway; (2) inclusion of defendant as a party to the Lease Amendment; and (3) reaffirmance of all provisions of the 1906 Lease.  The parties negotiated the following provisions, which eventually were included in the final draft of the Lease Amendment: (1) waiver of objection to construction; (2) construction and removal of the walkway; (3) maintenance of the walkway and insurance; (4) liens, taxes and assessments on the walkway; (5) reimbursement for the lessor's expenses and costs incurred in the negotiation of the Lease Amendment; (6) the lessee's indemnification of the lessor in case of default or other liability which the lessor may suffer; and (7) default by the lessee under the terms of the Lease Amendment, which would be considered a default by the lessee under the Lease. 

Pontikes sent drafts of the Lease Amendment to D. Albert Daspin, an attorney representing defendant.  Daspin reviewed the drafts and sent back revisions to Pontikes.  Compared to other provisions in the Lease Amendment, Pontikes spent a short amount of time negotiating the language of the integration clause, although he changed the language Daspin drafted to include use of the word, "reaffirmed," instead of "shall continue," with regard to the effect of Lease provisions, as shown in the following paragraphs.  The record shows no objection by defendant to inclusion of language reaffirming the terms of the Lease in the Lease Amendment.  The parties did not discuss the gold clause during negotiations.  

Plaintiff and defendant signed the Lease Amendment, entitled, "First Amendment To Lease," on February 24, 1989, with an effective date of November 30, 1988.  Pertinent to this appeal, the Lease Amendment stated, "[e]xcept as otherwise expressly modified by this first Amendment, all the terms and provisions of the Lease are reaffirmed and are not modified by this First Amendment." 

Thereafter, on September 16, 1998, plaintiff made a written demand to defendant that, commencing October 1, 1998, defendant had to pay the monthly rent "in gold coin, as provided in the lease."  Defendant's refusal to pay rent in gold triggered plaintiff's complaint for declaratory judgment and other relief. 

In its January 30, 2001 order, the circuit court found that no new obligation was undertaken by defendant after October 27, 1977.  According to the court, "[d]espite the use of the term reaffirm [in the Lease Amendment], nothing really changed except the fact that the bank was given permission to build a pedestrian walkway."  The court also held that no novation occurred.  The court's February 2, 2001 order denied plaintiff's summary judgment motion and granted defendant's motion as to counts I and II of the complaint.  Plaintiff appeals from the orders entered on March 21, 2000, and February 2, 2001. 

A reviewing court exercises 
de novo
 review when determining whether the circuit court properly granted a motion for summary judgment.  
Zoeller v. Augustine
, 271 Ill. App. 3d 370, 374, 648 N.E.2d 939 (1995) (
Zoeller
).  Summary judgment "shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  735 ILCS 5/2-1005 (West 2000).  Summary judgment is a "drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt."  
Purtill v. Hess
,  111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986). 
 The court must award summary judgment with caution to avoid preempting a litigant's right to trial by jury or his right to fully present the factual basis of a case where a material dispute may exist.  
Lamkin v. Towner
, 246 Ill. App. 3d 201, 204, 615 N.E.2d 1208 (1993).  In determining a summary judgment motion, the court must construe the pleadings, affidavits, depositions and admissions on file strictly against the moving party and liberally in favor of the opponent.  
In re Estate of Hoover
, 155 Ill. 2d 402, 410-11, 615 N.E.2d 736 (1993).  Reversal of a summary judgment motion is warranted if, on review of the case, a material issue of fact or an inaccurate interpretation of the law exists.  
Zoeller
, 271 Ill. App. 3d at 374.

Plaintiff initially asserts that the circuit court erred by granting defendant's summary judgment motion because the Lease Amendment created a new obligation to pay rent in gold.  Plaintiff argues, as a matter of law, that the Lease Amendment created a new contract and that defendant, as lessee, reaffirmed all the terms and provisions of the Lease without any exception for or exclusion of the gold clause and, therefore, because the new obligation was undertaken after October 27, 1977, the gold clause once again was enforceable under the federal legislative amendment.

Defendant responds that no case law holds that an amendment to a lease can revive a gold clause or that an affirmation of a pre-existing gold clause revives that clause.  Defendant contends that parties may modify or amend provisions of a contract without affecting their liabilities under other terms of the agreement.  Defendant further argues that its obligation under the Lease arose in 1976, upon the assignment, and that the Lease Amendment was a reaffirmance of its pre-October 1977 obligations.  According to defendant, a lease which expressly states that "all terms and provisions are reaffirmed and not modified by an amendment," is the complete opposite of a new obligation; rather, it is the mere continuance of an existing obligation.

First to be determined is whether the Lease Amendment was a new obligation "entered into" after October 27, 1977, thereby reviving the enforceability of the Lease's gold clause.  Although a limited number of cases have held that a post-October 27, 1977 novation of a lease created a new contract rendering the gold clause revived and enforceable
(footnote: 8), the instant case is the first to involve consideration of a lease amendment and its effect on reviving the enforceability of a gold clause.

Traditionally, Illinois courts, when interpreting contracts, have required that "[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it."  
Western Illinois Oil Co. v. Thompson
, 26 Ill. 2d 287, 291, 186 N.E.2d 285 (1962).  A lease is a type of contract generally governed by the rules of contract law.  
Midland Management Co. v. Helgason
, 158 Ill. 2d 98, 103, 630 N.E.2d 836 (1994) (
Midland
).  In construing a lease, courts give effect to the intentions of the parties as expressed in the language of the document when read as a whole.  
Midland
, 158 Ill. 2d at 104.  If contract language is unambiguous, the intention of the parties must be ascertained by the language used, not by constructions urged by the parties.  
MXL Industries, Inc. v. Mulder
, 252 Ill. App. 3d 18, 29, 623 N.E.2d 369 (1993).

A modification of a contract is a change in one or more respects that introduces new elements into the details of the contract and cancels others, but leaves the general purpose and effect undisturbed.  
Hartwig Transit, Inc. v. Menolascino
, 113 Ill. App. 3d 165, 170, 446 N.E.2d 1193 (1983).  A valid modification must satisfy all criteria essential for a valid contract, including offer, acceptance and consideration.  
Bass v. Prime Cable of Chicago, Inc.
, 284 Ill. App. 3d 116, 126, 674 N.E.2d 43 (1996).  

In 
Barrett v. Lawrence
, 110 Ill. App. 3d 587, 590, 442 N.E.2d 599 (1982) (
Barrett
), a case relied upon by plaintiff, the court found that "[a]n agreement when changed by the mutual consent of the parties becomes a new agreement which takes place of the old."
(footnote: 9)  There, plaintiff entered into a contract with defendant to purchase a condominium with final payment due on December 1, 1981.  On December 7, 1981, the contract was amended to extend the final date for payment and conveyance of title to January 1, 1982.  Plaintiff filed suit to force defendants to put payments she had made on the property into an escrow account as required by statute.  Defendants contended that the amendment to the contract did not create a new agreement but simply extended the time of the old agreement.

In support of its finding that defendants were required to put payments into an escrow account, the 
Barrett
 court cited 
Mahaffey v. Wisconsin Central Ry. Co.
, 147 Ill. App. 43, 46 (1909), which stated, "[a]n agreement changed is not the old or prior agreement but a new one.  When there is a change the minds of the parties have met again and by the fact of the change, a new agreement arises.  The minds of the parties may thus meet upon the terms of the old agreement with but the slightest change, yet the agreement then made is a new one." 

Two Illinois cases cited by the instant defendant, 
Deien Chevrolet, Inc. v. Reynolds & Reynolds Co.
, 265 Ill. App. 3d 842, 846, 639 N.E.2d 949 (1994) (
Deien Chevrolet
) and 
Nagle v. General Merchandising Corp.
, 58 Ill. App. 3d 344, 347, 374 N.E.2d 1137 (1978) (
Nagle
), both held that parties to a contract may modify its provisions without affecting the liability of the parties under the other terms.  Both 
Deien Chevrolet
 and 
Nagle
, however, involved  analyses of the parties' conduct with regard to an intent to modify the original agreement, not a written modification mutually consented to by both parties, as in the present case.

In 
McKay Nissan, Ltd. v. Nissan Motor Corp. in U.S.A.
, 764 F. Supp. 1318 (N.D. Ill. 1991) (
McKay Nissan
), plaintiff, an automotive dealership, alleged that defendant, a distributor, violated section 6 of the Illinois Motor Vehicle Franchise Act (Act) (1989 Ill. Rev. Stat. ch. 121 ½, par. 756) by failing to provide full compensation for certain warranty services provided by plaintiff.  Defendant moved to dismiss plaintiff's complaint, contending that plaintiff did not have a remedy under the Act because it was not in effect at the time the parties entered into their franchise agreement.  Plaintiff argued that the agreement was amended several times after the effective date of the Act and that the amendments essentially created a new agreement governed by the Act's provisions.  The four amendments to the original agreement included changes to reflect relocations of plaintiff's franchise, the corporate name and the residential address of plaintiff's executive manager.

Considering the modifications to the agreement as "routine," the 
McKay Nissan
 court found that an amendment does not necessarily create a new agreement because the original contract was changed to some extent.  764 F. Supp. at 1319.  The issue was not whether any changes were made to the contract, but whether existing rights were significantly altered.  According to the court, "[t]he modifications must effect a material alteration of the parties rights and obligations before it can be said that the parties intended a new contract or agreement."  
McKay Nissan
, 764 F. Supp. at 1319; see also 
Bitronics Sales Co. v. Microsemiconductor Corp.
, 610 F. Supp. 550, 557 (D. Minn. 1985); 
Easterby-Thackston, Inc. v. Chrysler Corp.
, 477 F. Supp. 954, 956 (D. S.C. 1979); 
In re Kerry Ford, Inc.
, 106 Ohio App. 3d 643, 651, 666 N.E.2d 1157 (1995); 17A C.J.S. § 408 (1999).  The 
McKay Nissan
 court noted that the parties did not renegotiate the terms of the original agreement.  The amendments at issue neither changed the parties' contractual rights nor varied the responsibilities and duties of either party.  The court held that the contractual modifications were too insubstantial to have established a new contract that replaced the original agreement.  
McKay Nissan
, 764 F. Supp. at 1320.

In determining materiality, "[a] change in the language of a document, whether by interlineation or otherwise, which if enforced would have a legal effect different from the original language, is a material change."  
In re Busse
, 124 Ill. App. 3d 433, 442, 464 N.E.2d 651 (1984).  Here, the changes to the Lease Amendment, unlike the amended agreement in 
McKay Nissan
, cannot be considered "routine modifications" because they were material to the parties' contractual rights, responsibilities and duties due to the nature of the agreement to construct, maintain and insure the new walkway, and the parties' agreement to reaffirm the terms of the Lease. 

Other courts considering the enforceability of gold clauses in leases determined whether a novation which the parties entered into after October 27, 1977, amounted to a new obligation.  See 
Trostel I
, 92 F.3d at 742;  
Wells Fargo
, 32 Cal. App. 4th at 437; 
Fay Corp.
, 646 F. Supp. at 949.

In 
Trostel I
, a 1917 commercial property lease contained a gold clause.  On August 15, 1990, the lessee of the property, The Statesman Group, Inc., transferred its leasehold interest to defendant, American Life & Casualty Insurance Company, by a recorded warranty assignment and assumption.  The 1990 warranty agreement provided that defendant, as grantee, "accepts, assumes and agrees to be bound by all of the terms and conditions to be kept, observed and performed by the lessee in said lease ***."  The district court granted defendant's summary judgment motion, finding that even if a new obligation had been created in 1990, the gold clause could not have been incorporated in it by reference to terms in the 1917 lease because the 1933 Congressional resolution rendered the clause void.  The 
Trostel I
 court of appeals found nothing in the terms of the 1933 Congressional resolution that suggested gold clauses were to be eliminated or severed from existing contracts; rather, Congress merely declared that they were unenforceable.  92 F.3d at 741-42.  The court of appeals concluded that the 1990 warranty agreement was a novation and, consequently, the gold clause was enforceable because, under Iowa law, the novation amounted to a new obligation.  
Trostel I
, 92 F.3d at 740-41.  

The court in 
Wells Fargo
 provided an analysis of Congressional intent in enacting the 1977 amendment, noting that the amendment "stands neutral in that pre-1933 contracts with gold clauses remain subject to the traditional laws of contract, as judicially interpreted, which include[s] the concept of novation. ***  If Congress had intended to restrict the 1977 amendment only to an original contract involving the original parties and not to a novation amounting to a new obligation *** such narrowing language could have been used in the amendment."  32 Cal. App. 4th at 435-36.  Both courts in 
Wells Fargo
 and 
Fay Corp.
 found that a novation was a new obligation within the meaning of the 1977 amendment.  646 F. Supp. at 950-51; 32 Cal. App. 4th at 437.  According to the 
Fay Corp.
 court, "[a] novation is a new obligation unto itself as of the date the substitution of parties is complete."  646 F. Supp. at 949, n. 7.  

Likewise, in the case 
sub
 
judice
, the Lease Amendment created a new obligation within the meaning of the 1977 federal amendment.  As above-noted, Illinois law does not hold that every time a contract is somehow altered or amended, a new contract is formed.  Instead, courts observe whether the contractual modifications were significant enough to change the parties' obligations under the particular contract.  Here, the Lease Amendment increased defendant's obligations to plaintiff under the Lease because defendant undertook new construction on the subject premises and, after completion of the constructed walkway, defendant agreed, among other things, to maintain, repair and insure the walkway.  These changes significantly and materially altered the existing rights and obligations of both parties.

Further, the gold clause was valid at the time the Lease was executed originally and, although it was rendered unenforceable after 1933, it remained as a term within the Lease.  Nothing in the Lease Amendment indicated that defendant accepted only those obligations that had been legally enforceable against all previous lessees; rather, defendant specifically agreed to "reaffirm" all terms and provisions in the Lease.  
 

Illinois courts follow the four corners doctrine when interpreting contracts, looking primarily to the language of the contract to determine whether it is susceptible to more than one meaning.  
Air Safety, Inc. v. Teachers Realty Corp.
, 185 Ill. 2d 457, 462, 706 N.E.2d 882 (1999) (
Air Safety
).  Contract language that is facially unambiguous is interpreted without the use of parol evidence, as a matter of law.  
Air Safety
, 185 Ill. 2d at 462.  In addition, contractual agreements are construed against the drafter.  
Metropolitan Life Insurance Co. v. American National Bank & Trust Co.
, 288 Ill. App. 3d 760, 769, 682 N.E.2d 72 (1997).  

The Lease Amendment's integration clause, including its use of the word "reaffirmed," was unambiguous and demonstrated that  defendant obligated itself anew to pay rent in gold.
(footnote: 10)  The Lease Amendment was negotiated and drafted by both parties' attorneys over a period of six months.  Defendant, initially responsible for drafting a version of the Lease Amendment's integration clause, cannot now argue that it did not intend to sign an agreement incorporating the terms of the original Lease or that the clause has no legal force and effect.  As a matter of law, when the parties entered into an agreement for the Lease Amendment, they reaffirmed the terms of the Lease, including the requirement that rent be paid in gold.   

In sum, the Lease Amendment effected a material alteration of the parties' rights and obligations under the Lease and, therefore, the Lease Amendment was a new obligation effectuated after October 27, 1977, thereby reviving the enforceability of the gold clause in the Lease.

The gold clause's enforceability raises an issue as to how much plaintiff should be paid with respect to gold coin "of not less than the present weight and fineness, which is at the present time measured by the standard of weight and fineness" equaling "twenty three and twenty-two hundredths (23-22/100) grains Troy weight for each dollar."  In other words, whether defendant must pay rent in gold using current value or 1906 value in Troy weight must be determined.

The Eighth Circuit in 
Trostel v. American Life & Casualty Insurance Co.
, 168 F.3d 1105, 1108 (8th Cir. 1999) (
Trostel III
), found that although no direct evidence of the parties' intent existed when entering into the original 1917 lease, the language and purpose of the gold clause supported using the 1917 value of gold to calculate the lease payments at issue.  The court reasoned that the 1990 novation did not create a new gold clause, rather, it incorporated the gold clause from the 1917 lease.  The word "present," as used in the 1917 lease implied an existing standard and drafters of the lease did not use other language to intend a "shifting standard (such as 'the then applicable standard')."  
Trostel III
, 168 F.3d at 1109.

Further, the 
Trostel III
 court noted public policy in its decision, stating that the purpose of gold clauses is to protect lessors against inflation.  168 F.3d at 1109.  According to the court, "[t]his protection would be meaningless if the baseline value of gold were revised anytime the lessee transferred the leasehold interest to a new obligor.  The only way for the gold clause to serve its function to protect the lessors against inflation is to use the 1917 value of gold."  
Trostel III
, 168 F.3d at 1109.  

The instant Lease Amendment did not create a new gold clause; rather, it incorporated the gold clause from the Lease.  Although no direct evidence of the parties' intent existed when entering into the Lease in 1906, the language and purpose of the gold clause supports using the 1906 value of gold to calculate the lease payments at issue.  Similar to the 1917 lease language in 
Trostel III
, the Lease requires payments in gold under a "present" standard.  Defendant should be ordered to pay plaintiff rent in the 1906 value of gold.  In light of these findings, the issue of novation need not be considered.

The decision of the circuit court of Cook County granting defendant's summary judgment motion is reversed and the cause is remanded with instructions as noted above.  The court further is instructed to enter summary judgment in favor of plaintiff on counts I and II of its complaint.

Reversed and remanded with instructions.

HOFFMAN, P.J., and THEIS, J., concur.

FOOTNOTES
1:
The joint resolution provides in pertinent part:

"(a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold *** is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. *** Any such provision contained in any law authorizing obligation to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law."  H.R.J. Res. 192, 73rd Cong. (1933) (formally codified at 31 U.S.C. § 463) (1933 Congressional resolution).  

2:
The amendment states:

"(d)(1) In this subsection, "obligation" means any obligation (except United States currency) payable in United States money.

(2) An obligation issued containing a gold clause or governed by a gold clause is discharged on payment (dollar for dollar) in United States coin or currency that is legal tender at the time of payment.  This paragraph does not apply to an obligation issued after October 27, 1977."  31 U.S.C. § 5118 (d)(1), (2) (2000) (Section 5118 (d)(1) and (2)).

3:
The first three assignments expressly provided that neither the assignor nor assignee were released from prior obligations under the Lease.  

4:
Articles of dissolution were issued for Building Corporation on May 31, 1977.  

5:
The 1976 Lease assignment provides:

"The Mid-City National Bank of Chicago, its successor and assigns, in consideration hereof, does hereby for itself, its successors and assigns, accept this conveyance, transfer and assignment and does accept and assume all of the terms, covenants and agreements in said Indenture of Lease contained to be kept and performed by the said Lessee therein, and does covenant and agree that it will comply with them and will be bound by them and will keep and perform the same." 

6:
A letter, dated April 10, 1984, from Jeffrey N. Weissman,  real estate officer for Northern Trust, to Mark Abrahamson, defendant's employee, indicated that defendant was the lessee of the subject premises, demonstrating Northern Trust's knowledge that Building Corporation was no longer the lessee.

7:
The lease synopsis also stated that on May 8, 1933, Building Corporation had "agreed with The Mid City National Bank of Chicago to allow Mid City Bank to pay Real Estate taxes and ground rent - to be a loan."  Because defendant paid ground rent to the lessor since 1933, Anagnost had no reason to believe that any party other than Building Corporation, was the lessee.

8:
See 
Trostel v. American Life & Casualty Insurance Co.
, 92 F.3d 736 (8th Cir. 1996) (
Trostel I
), 
vacated
, 519 U.S. 1104, 136 L. Ed. 2d 829, 117 S. Ct. 939 (1997), 
reinstated
, 133 F.3d 679 (8th Cir. 1998) (
Trostel II
); 
Wells Fargo Bank, N.A. v. Bank of America NT & SA
, 32 Cal. App. 4th 424, 38 Cal. Rptr. 2d 521 (1995) (
Wells Fargo
); 
Fay Corp. v. BAT Holdings I, Inc.
, 646 F. Supp. 946 (W.D. Wash. 1986), 
aff'd sub nom
, 
Fay Corp. v. Frederick & Nelson Seattle, Inc.
, 896 F.2d 1227 (9th Cir. 1990) (
Fay Corp.
).        

9:
Plaintiff also cites the following sections in American Jurisprudence and Corpus Juris Secundum:

"The modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement, while leaving the balance of it intact.  Although the effect of the modification is the production of a new contract, it consists not only of the new terms agreed upon but of as many of the terms of the original contract as the parties have not abrogated by their modification agreement."  17A Am. Jur. 2d § 529 (1991).

"An agreement, when changed by the mutual consent of the parties, becomes a new agreement.  Such new agreement takes the place of the old and determines the rights of the parties to the new agreement.  In such case, the agreement between the parties consists of the new terms and as much of the old agreement as the parties have agreed will remain unchanged."  17A C.J.S. § 408 (1999). 

10:
"Reaffirmed" is defined as "to affirm again" especially so as "to strengthen or confirm."  Webster's Third New International Dictionary 1890 (1993).