1-03-0149 FOURTH DIVISION

JULY 17, 2003

TIMOTHY FELDHEIM, RICK OLSWANGER, DAVE ) Appeal from the

BARTELSTEIN, JOHN ZAWASKI, and VIRGINIA ) Circuit Court of

McGATHEY, on behalf of themselves and ) Cook County.

all others similarly situated, )

)

Plaintiffs-Appellants, ) 

)

v. ) 

)

FRANK L. SIMS, MICHAEL B. ALEXANDER, )

JERRY R. STEINBORN and TRUIT E. TROGDON, )

on behalf of themselves and all others )

similarly situated, ) Honorable

) Patrick McGann,

Defendants-Appellees. ) Judge Presiding.

JUSTICE HARTMAN delivered the opinion of the court:

Involved in this appeal is the restructuring of the Chicago Board of Trade (CBOT), the largest futures and options exchange in the United States, from a not-for-profit Delaware corporation to two, fully-demutalized, for-profit Delaware corporations, establishing open outcry (New CBOT) and electronic trading (eBOT) businesses (collectively, proposed CBOT), as delineated by a January 19, 2000 resolution of the CBOT Board of Directors (Board).  As of March 8, 2002, the CBOT membership was comprised of five different classes including full memberships (FMs) (1402 seats), collectively, the majority; and associate memberships (AMs) (789 seats), Government Instruments Market (GIMs) (156 seats), Community Options Market (COMs) (643 seats) and Index, Debt and Energy Market (IDEMs) (642 seats), collectively, the minority.  The class-certified plaintiffs own minority membership interests in the CBOT, and sought declaratory and injunctive relief on their behalf and as representatives of a class of all persons who own CBOT minority memberships, against the defendants, named individually and as representatives of a class of FMs.

Plaintiffs challenge the circuit court's entry of summary judgment against them, which ruled that the majority FMs were not controlling shareholders of the CBOT, thereby denying plaintiffs  an "entire fairness hearing" on the allocation of CBOT's equity when it is restructured as the proposed CBOT.  Plaintiffs claimed that under Delaware law, as controlling shareholders the FMs owe fiduciary duties to the minority in connection with any vote which affects the minority's ownership interest. Defendants moved to dismiss the amended complaint pursuant to sections 2-615 (735 ILCS 5/2-615 (West 2000) (section 2-615)) and 2-619 (735 ILCS 2-619 (West 2000) (section 2-619)) of the Code of Civil Procedure (Code).  Initially, the circuit court denied defendants' motions.
(footnote: 1) 

Plaintiffs filed second and third amended complaints for declaratory and injunctive relief.
(footnote: 2)  The circuit court then certified both classes.  Thereafter, defendants moved for summary judgment, alleging that (1) FMs owe no fiduciary duty to the minority members; (2) the 1,402 FMs each are owned by individuals and do not constitute a  majority ownership in the CBOT; (3) no evidence exists showing the control or dominance of the FMs in the business of the CBOT in general, or in the corporate restructuring process; and (4) FMs are entitled to the protection of the business judgment rule.  The court granted summary judgment in favor of defendants and against plaintiffs, finding that (1) the CBOT has no majority shareholders; (2) no shareholders took part in the allocation process; (3) FMs did not exercise any domination or control over the affairs of the CBOT; and (4) no question of material fact existed.  Plaintiffs unsuccessfully moved to reconsider and vacate the order granting summary judgment.  This appeal followed.  

The parties agree that the forthcoming change in the CBOT will be historic; CBOT's structure should be altered from a nonstock, not-for-profit entity to the proposed CBOT; all CBOT's equity will be reallocated among its membership; and recent changes in the futures industry, including the rise of electronic trading, require that the CBOT must modernize its corporate structure to remain a leading exchange.

In early 1999, the CBOT Strategy Committee, which did not include members of the CBOT Board, was involved in the preliminary stages of restructuring and the development of initial recommendations.  In August 1999, the CBOT Board established a Restructuring Task Force (Task Force).  No AMs or IDEMs were appointed to the Task Force.  The Task Force was charged with developing a restructuring plan to modernize the CBOT's structure and governance in order to compete in the evolving marketplace.  The Task Force conducted a comprehensive, strategic evaluation over a period of six months, aided by CBOT staff, a management consulting firm, an investment banking firm and outside counsel.  In January 2000, the Task Force presented its recommendations to the Board, which approved the recommendation with respect to the restructuring strategy and appointed an Implementation Committee to refine further the details of the plan.  All but one of the Implementation Committee members were FMs.
(footnote: 3)  

In addition, an independent Allocation Committee (Allocation Committee), comprised of five CBOT "outside directors," was appointed to develop a recommendation to the Board regarding an appropriate and fair allocation of value among CBOT members in connection with the restructuring and allocation of shares in the proposed CBOT.
(footnote: 4)  The members of the Allocation Committee owned no membership interests in the existing CBOT.  No CBOT rules or legally binding agreements between the membership classes address the allocation of equity with respect to for-profit restructuring.

The Board, comprised of a majority of FMs, appointed the Allocation Committee which engaged William Blair and Company (William Blair), an investment banking firm, to develop an allocation proposal.  In preparing a series of reports for the Allocation Committee, William Blair recognized that  "[f]ulls control voting; any allocation should satisfy Full Members if it is to receive a favorable vote."
(footnote: 5)  William Blair reviewed a large collection of data, including (1) CBOT rules delineating membership rights concerning trading, voting and liquidation; (2) financial data regarding trading volume and historical seat prices; (3) precedent from other exchanges that completed a demutualization process; and (4) restructuring presentations provided by other advisors to the CBOT.  William Blair also met with minority membership committees and selected FMs, various CBOT staff and former staff members and an Allocation Committee member to solicit input regarding potential approaches to the allocation.  

Deposition testimony from William Blair analysts who worked on the development of an allocation methodology, which was followed by the Allocation Committee, was submitted to the circuit court.  The importance of this testimony to the resolution of this appeal requires that it be set forth in some detail.

Mark Calzolano, William Blair vice-president of the mergers and acquisitions group, testified that the CBOT restructuring was proposed as a demutualization rather than a liquidation; otherwise, the liquidation could extinguish the CBOE exercise right.  William Blair presented various allocation methodologies and the Allocation Committee ultimately decided to put more emphasis on certain factors such as liquidation rights, voting rights and Ceres transaction precedent
(footnote: 6) because the committee agreed to that methodology.  Calzolano did not recall whether William Blair suggested that more importance be given to those three factors.

Minutes from a May 1, 2000 Allocation Committee meeting attended by Calzolano, John Ettelson, chief financial officer at William Blair, and Chris Cotter, a William Blair principal, state in reference to allocation ratios presented to the committee, "[d]uring the course of this discussion, the Committee and William Blair concurred that in establishing an allocation ratio relatively greater importance should be given to liquidation rights/voting rights and the Ceres allocation without assigning a specific weight to any single factor."  William Blair completed a "sensitivity analysis," a subjective assessment based on the allocation methodologies, in order to determine what the lower and upper boundaries of the ratio should be.
(footnote: 7)   Calzolano stated that, "as a team, we collectively decided on the range" of allocation ratios, which varied from 4.5 to 1, 4.75 to 1, 5 to 1 and 5.25 to 1, with respect to equity distribution between FMs and AMs.  According to Calzolano, these numbers were not developed through mathematical calculations, but represented a "range of fairness."  The committee ultimately decided on a 5 to 1 allocation ratio between FMs and AMs, but never explained why it chose that ratio.  Significantly, how William Blair chose the numbers for the ratios was unknown.

Cotter testified by deposition that William Blair represented all membership classes when formulating the allocation methodology, but gave greater emphasis to liquidation rights, voting rights and the Ceres transaction precedent, instead of seat market value and trading volume.  Voting rights were incorporated into the seat market value.  In addition, William Blair valued the CBOE exercise right at $50,000, which was subtracted from the seat market value of a full membership to eliminate the impact of the CBOE value.  William Blair ultimately decided not to assign specific weights to the five factors
(footnote: 8) that it recommended be used for the allocation methodology.  

Cotter testified that Ettelson created the ranges of allocation ratios based upon consideration of all the relevant factors.  According to Cotter, Ettelson made the final decision as to what the allocation should be.  The Allocation Committee selected the 5 to 1 ratio after William Blair presented the range of ratios.  Cotter did not recall why the committee chose that ratio.  

By deposition, Ettelson testified that he headed the William Blair allocation team.  The Allocation Committee directed William Blair with respect to the nature of the assignment, but not specifically as to how to carry out that assignment.  The "fairness" of an allocation varies from situation to situation and is measured by analyses that William Blair and others have performed over time in similar circumstances that have become precedent.  For precedents in this case, William Blair looked to demutualizations of other exchanges, but nothing was comparable.  To render the allocation, William Blair generally considered different methodologies and collected input from Dr. Hamada, certain CBOT officials, representatives of various member classes, the committee and counsel from Sonnenschein, Nath & Rosenthal and Winston & Strawn.  Minority members told Ettelson that, depending on the class, they believed they were entitled to a certain share or greater share of the ownership of the proposed CBOT than otherwise might be chosen.  

Ettelson stated further that liquidation rights, voting rights, Ceres transaction precedent, seat market values, trading volume and a combination approach were the six substantive factors that William Blair considered in its analysis.  Seat market values encompass membership rights with respect to trading, voting, liquidation and CBOE exercise rights.  When membership classes first were created, voting rights were determined by seat market values and, as a result, Ettelson considered that precedent when formulating an allocation methodology.
(footnote: 9)  William Blair considered 1999, 1995 to 1999 and spot values
(footnote: 10) in determining seat market values as measures in the ultimate fairness opinion.  Consideration of each seat market value was necessary to remove any short-term factors that potentially affected the spot price analysis since the underlying economics of trading rights change over time.  William Blair considered five-year prices from 1995 to July 21, 1999, the last date prior to a public announcement of the CBOT restructuring, after which the seat market values were affected due to speculation. 

A William Blair May 5, 2000 presentation to the CBOT Board stated an "[u]ncertainty regarding treatment of (and value of) the CBOE exercise right," which referred to the potential impact that the CBOE exercise right may have had on the seat values of different membership classes.  According to Ettelson, "[t]he CBOE exercise right is contained as part of a bundle of rights in the full membership, and I observe only the price of the full membership and not the price of its component pieces.  And although I can observe a value of a full membership, or a membership over at the CBOE, it contains different rights than those that are contained in the bundle in the full membership interest.  So it's not a direct comparison there."  Ettelson testified that there is no direct way to extract the value of the CBOE exercise right when determining seat market values.  William Blair did not attempt to separate the ownership elements from the trading rights within the seat market price.  Also, William Blair did not conduct an analysis or study to determine how much of the seat market prices are comprised of liquidation rights.
(footnote: 11)  Equity ownership, as a general matter, connotes more than liquidation value rights.  Since the CBOT was not yet a for-profit corporation, liquidation was the factor that William Blair viewed most as an "equity-like notion."  The rationale of considering trading volume as a factor in the allocation methodology is based upon each membership's contribution to the overall liquidity and value of the CBOT.  

The membership class that creates value in the CBOT is entitled to some ownership in the value of the entity, Ettelson pointed out; however, holders of multiple memberships in various classes can skew volume figures and, as a result, William Blair could not subtract this factor from trading volume contributions.  Trading volume was considered on a class basis, whereas seat market value was determined on a per-seat basis.  If trading volume were considered on a per-seat basis, the AM's volume per seat would be greater than the FM's volume per seat.  Liquidation was utilized as an allocation factor because (1) although the CBOT would not affect the restructuring by means of a liquidation, the CBOT could have achieved the same result in restructuring through liquidation, and in that case, the allocation would have been made according to liquidation rights; (2) CBOT rules stated that liquidation was the only relative determination of value - there were no other determinations of value in the CBOT rules; (3) as people bought their seats and different membership interests, they were aware of the liquidation rights when they bought them; and (4) Ceres transaction precedent was allocated in the liquidation rights.  The CBOT restructuring was not completed by a process of liquidation because the CBOT did not want people to speculate that they were going out of business.  The Ceres transaction, which was allocated on the basis of dissolution rights, was an important factor in the allocation analysis because William Blair viewed it as an example of a previously allocated item of value distributed to different membership classes.  Ettleson claimed that William Blair did not give more weight to liquidation rights, voting rights or Ceres precedent.

Ettelson's testimony went on to say that to assist the Allocation Committee in creating the allocation ratio, William Blair discussed which factors in collaboration should be given relatively greater weight or importance in the analysis in order to arrive at a fair allocation.  Ettelson explained that "greater weight was attributable to the 6-to-1 numbers" from the liquidation rights, voting rights and Ceres transaction.  Ettelson stated that the range of ratios from 5.25, 5.00, 4.75 and 4.50 to 1 were picked mathematically to represent the allocation because "they were round numbers."  The numbers were not mathematically calculated, rather they were formulated after an analysis of the factors "to represent in the column to use as a basis for discussion."  No specific calculation was made in formulating the proposed ratio numbers.  Ettelson did not recall why the committee chose the 5 to 1 ratio. 

The Allocation Committee also considered the views of CBOT members and membership interest holders.  It sent letters to the entire membership and invited comments concerning the upcoming allocation.  In response, the Allocation Committee received dozens of letters from FMs, AMs and other minority membership interest holders, who offered a range of opinions about what they considered a fair allocation.  Although all members and membership interest holders were free to offer their suggestions about the allocation, no member or group of members pressured the Allocation Committee to adopt any particular allocation or otherwise attempted to dictate the outcome of their decision-making.

On May 16, 2000, the proposed CBOT restructuring report was presented to the CBOT Board.  CBOT's restructuring plan initially would require a conversion from its present status as a Delaware not-for-profit corporation to the proposed CBOT, which then will require a majority vote of the CBOT membership following the Board's approval.
(footnote: 12)  Pursuant to this plan, the CBOT would form an open outcry trading company and a wholly-owned, for-profit corporation subsidiary for the purpose of reorganizing the CBOT's electronic trading business.  The May 16, 2000 report proposed that the subsidiary would increase value in current membership interests in the CBOT through a potential initial public offering.  Additionally, the new, open outcry corporation would replicate the business of the current CBOT and would remain closely held by the current CBOT membership after allocation of shares in the new company.  

The Allocation Committee selected a stock allocation methodology for the proposed CBOT that was recommended to, reviewed and approved by the CBOT Board, and will be voted upon by CBOT members as part of the next step of the restructuring plan.
(footnote: 13) According to the stock methodology developed by William Blair, as reviewed by the Allocation Committee and approved by the CBOT Board, the FMs would receive 88.07% of the shares in the proposed CBOT, while AMs would receive 9.72% of the shares.  GIMs would divide 1.16%, COMs would receive 0.57% and IDEMs would share 0.48% of the allocated stock.
(footnote: 14)
 Each majority member, then, would receive 5 shares of stock per seat and minority members would receive from 6/100 of a share to 1 share per seat, although, from 1995 to 1999, FM majority members paid an average of only 1.87 times as much for their seats as AMs and minority members generated more than 60% of CBOT's trading volume total from 1997 to 2001. 

On August 11, 2000, plaintiffs filed their original one-count complaint for declaratory judgment and injunctive relief, alleging that under Delaware law, the CBOT FM majority owed fiduciary duties to the minority and, as part of their fiduciary duties, FMs were precluded from exploiting their control position to their own benefit and to the detriment of the minority and were obligated to provide the minority with fair value in connection with the restructuring.  The complaint further alleged that "the proposed allocation would unfairly benefit the Majority Full Members to the detriment of the Minority Owners," and "[a]s such, it would be a breach of fiduciary duty for the Majority Members, or any of them, to vote in favor of the proposed allocation in connection with the next phase of the CBOT restructuring."  Plaintiffs sought relief in the form of a declaration that the allocation methodology was unfair and inequitable, an injunction to prohibit the majority members from voting in favor of any allocation based on that methodology and a declaration as to a fair and equitable methodology and allocation of shares.  

Defendants moved to dismiss the complaint pursuant to section 2-615 of the Code, asserting that the complaint failed to state a claim, specifically, that the allegations were insufficient, as a matter of law, to establish that the FMs had fiduciary obligations to the CBOT's minority members.  

Thereafter, on November 15, 2000, plaintiffs filed an amended complaint, which included detailed, factual allegations regarding the FMs' domination and control over the CBOT; and that the FM majority consistently has used its "overwhelming voting power" to dominate and control the corporation.
(footnote: 15) 

Plaintiffs further asserted that the FMs utilized their voting power to enact rules which institutionalized the FMs' control over the CBOT.  As an example, plaintiffs noted that pursuant to CBOT rules, disputes between members which arise out of exchange business must be resolved via internal arbitration.  New rules must be approved by voting members in the aggregate, rather than by separate group voting.  CBOT rules provide that no rule or amendment can be enacted without at least 300 votes cast.  A majority of the 300 votes allows the rule or amendment to be enacted.  Minority members have only 131 votes in total; therefore, they are prevented from amending CBOT rules without the support of FMs.  

Plaintiffs listed other examples in support of their claims that the FM majority dominates and controls the CBOT's governance to prefer the interests of FMs to the detriment of the minority, including: (1) the elimination of the GIM as an independent seat; (2) the allocation of rights to trade silver only to FMs; and (3) the adoption of rules requiring certain products to be cleared by FMs and not by AMs.  Also, the FM-dominated Board voted to ensure that the FMs' defense of this lawsuit be financed, in part, by the minority, through the passage of a Board resolution requiring the CBOT to indemnify fully the FMs from all costs and expenses associated with this action.   

In arguing that the allocation methodology for the proposed CBOT companies was unfair, plaintiffs noted that all members and membership interest holders pay equal amounts to trade on the CBOT's facilities, for a per contract rate, and that FMs, AMs, GIMs, COMs and IDEMs pay dues to the CBOT on a 3/2/1/1/1 ratio; however, the proposed 5/1/.5/.07/.06 ratio for allocation of shares in the proposed CBOT do not reflect the minority's contributions to the entity.  Further, although the Allocation Committee awarded FMs five shares in the proposed CBOT for every one share allocated to the AMs, the median market value of a FM seat during the period 1995 to 1999 was only 1.87 times greater than the median market value of an AM seat during the same period; if the allocation of shares was in line with the median market values for the 1995 to 1999 period, then FMs would have been allocated only 1.87 shares to every one share allocated to AMs instead of the five to one proposed allocation.  Plaintiffs argued further that the GIM, COM and IDEM proposed allocations similarly were highly disproportionate to historical GIM, COM and IDEM market values compared to the historical market of full memberships.  

On January 9, 2001, defendants filed separate motions to dismiss pursuant to sections 2-615 and 2-619 of the Code.  In their section 2-615 motion, they argued that plaintiffs failed to allege any facts to support the conclusional allegation that CBOT's FMs owe fiduciary duties to AMs and other membership interest holders.  Specifically, defendants noted that no Delaware law supported the argument that a stockholder can be held to have the fiduciary duties of a "controlling stockholder" based solely on his status as the owner of a particular class of stock that comprises a majority of the corporation's outstanding shares. 

On January 25, 2001, the circuit court heard argument on the motions to dismiss the amended complaint.  The court first denied the section 2-615 motion to dismiss, finding that "the amended complaint, taken as a whole, sufficiently alleges that the defendants have consistently used their voting power to enact rules, regulations and policies that are detrimental to the interests of the minority members," and that "an actual controversy exists as to whether the proposed [restructuring] formula is fair and equitable to the minority members."  In denying the section 2-619 motion, the court stated that the motion neither negated the allegations of the complaint, nor put the issue to rest.

On May 31, 2002, defendants moved for summary judgment on count I of plaintiffs' third amended complaint on the ground that there was no basis for imposing a fiduciary duty on an entire class of CBOT members; the applicable Delaware law does not impose a fiduciary duty on a shareholder, unlike a director, unless the shareholder owns a majority of the shares or exercises actual control over the corporation; plaintiffs' choice to sue the individual defendants who had no role in the allocation planning and a class of similarly situated FMs committed them to proving a fiduciary duty theory that shows either (1) a majority owner or a majority voting bloc of the 1,402 full memberships or (2) the owners of the 1,402 full memberships have combined and exercise actual control over the business affairs of the CBOT.  

Plaintiffs filed a lengthy reply in opposition to the  summary judgment motion, attaching numerous deposition transcripts, affidavits and other exhibits: arguing first, Delaware courts require "entire fairness" hearings in controlling shareholder cases despite the existence of a special committee of independent directors and that, if the CBOT FMs are found to be controlling shareholders, they must bear the burden of proof at trial under the "entire fairness" test; second, because the FMs dominate and control the CBOT, the Allocation Committee cannot insulate them under the business judgment rule; third, the factual record contained overwhelming evidence of domination and control that creates disputed issues or inferences of material fact for consideration at trial; fourth, the FMs were members of an exclusive club, bound together by multi-fold rules and practices that give them substantial control over the CBOT's governance and economic benefits every day at the expense of the minority members; and fifth, courts have found group domination and control in a wide variety of circumstances, depending on the particular facts of each case, regardless of corporate affiliations or strict voting agreements.

Following argument on defendants' summary judgment motion, the circuit court noted that the proposed stock allocation would not affect the trading rights of CBOT's members.  The court also noted that minority members would have increased voting rights from 8.34% to 11.9%, and increased dissolution and profit distribution rights.  The court first found that "[t]he undisputed facts in this case indicate there is no majority shareholder on the Board of Trade."  The court stated that "[u]nder Delaware law, with the exception of one decision, the determination of whether a minority has combined to impose the will on the minority is transaction based," and that "[a] shareholder only becomes a fiduciary when the shareholder crosses the line and becomes the manager by either negotiating or dictating both sides of the transaction."  Apparently, the court considered the FMs as individual minority shareholders in determining the summary judgment motion.  The court stated that the transaction-based approach was sensible "because it is inherently unfair to call upon a shareholder to defend a transaction they did not dictate, nor is it appropriate in light of the rule that a shareholder is free to vote in his or her own self-interest."  

The circuit court then found that there was no evidence in the record of direct involvement by voting members other than the "outside directors" in the allocation process.  According to the court, the evidence was clear that "while there may have been informal discussions, informal meetings concerning the allocation among or between the many members of the Board of Trade, the only input they had was in response to a solicitation by the allocation committee, and only certain members, a few members, responded to that invitation."  The court ruled that the Allocation Committee was not controlled or directed by any CBOT member.  The court found no question of material fact and granted summary judgment in favor of the defendant class and against the plaintiff class.  A motion to reconsider and vacate the court's decision to grant summary judgment was denied. 

Summary judgment will be granted only when the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 2000).  When reviewing the grant of a summary judgment motion, this court may consider pleadings, depositions, and admissions on file, together with any affidavits.  735 ILCS 5/2-1005(c) (West 2000).  The award of summary judgment is a "'drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt.'"  
Nebel, Inc. v. Mid-City National Bank
, 329 Ill. App. 3d 957, 962, 769 N.E.2d 45 (2002) (
Nebel
), quoting 
Purtill v. Hess
, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986).  Summary judgment must be granted with caution to avoid preempting a litigant's right to trial by jury or his right to present fully the factual basis of a case where a material dispute may exist.  
Nebel
, 329 Ill. App. 3d at 962.  When determining whether summary judgment is appropriate, the court must construe the pleadings, affidavits, depositions and admissions on file strictly against the moving party and liberally in favor of the opponent.  
Nebel
, 329 Ill. App. 3d at 962-63.  "Reversal of a summary judgment motion is warranted if, on review of the case, a material issue of fact or an inaccurate interpretation of the law exists."  
Nebel
, 329 Ill. App. 3d at 963.  Review of the decision to grant summary judgment in the instant case is 
de
 
novo
.  
Anderson v. Alberto-Culver USA, Inc.
, 317 Ill. App. 3d 1104, 1110, 740 N.E.2d 819 (2000).

In addition, pursuant to Illinois choice-of-law principles, plaintiffs' claims are governed by the law of the state of incorporation.  The CBOT currently is a not-for-profit Delaware corporation.  Therefore, Delaware law applies.  See 
Prime Leasing, Inc. v. Kendig
, 332 Ill. App. 3d 300, 314, 773 N.E.2d 84 (2002); 
Lipman v. Batterson
, 316 Ill. App. 3d 1211, 1215, 738 N.E.2d 623 (2000).   

Plaintiffs assert that applicable Delaware law requires an "entire fairness" hearing in the instant case where the controlling FM majority engaged in a self-dealing transaction, claiming that the allocation of equity among CBOT membership is a self-dealing transaction because the majority caused the CBOT to act in such a way that it would receive something from the CBOT to the exclusion and detriment of the minority members, citing 
Sinclair Oil Corp. v. Levien
, 280 A.2d 717, 720 (Del. 1971) (
Sinclair
).  They maintain that the proposed allocation was not "an arm's-length transaction," and that the development of the allocation plan did not include meaningful negotiation or representation on behalf of the minority members' interests.  Since the restructuring distributes the CBOT's equity unevenly among the membership classes, plaintiffs insist that it allows the FMs to abuse their control and take an inequitable portion for themselves; an entire fairness hearing under Delaware law would prevent such an outcome. 

A majority shareholder, or a group of shareholders who combine to form a majority, has a fiduciary duty to the corporation and to its minority shareholders if the majority shareholder dominates the board of directors and controls the corporation.  
In re Reading Co.
, 711 F.2d 509, 517 (3rd Cir. 1983) (
Reading
) (applying Delaware law); 
Kaplan v. Centex Corp.
, 284 A.2d 119, 122-23 (Del. Ch. 1971) (
Kaplan
).  The circumstances of the challenged action or inaction dictate the scope of the fiduciary duty.  
Nixon v. Blackwell
, 626 A. 2d 1366, 1376 (Del. 1993);
(footnote: 16)  
Reading
, 711 F.2d at 517.  If a shareholder plaintiff can prove that the majority shareholder has used his control over the corporation's board of directors to engage in self-dealing, Delaware law requires judgment of the self-dealing action of the dominated board by the entire fairness test.  
Reading
, 711 F.2d at 517-18; 
Sinclair
, 280 A.2d at 719-20.  Self-dealing occurs when the majority shareholders cause the dominated corporation to act in such a way that the majority shareholders receive something from the corporation to the exclusion and detriment of the minority shareholders.  
Sinclair
, 280 A.2d at 720.

The supreme court of Delaware also has held, however, that the entire fairness test remains applicable even when an independent committee is utilized because the underlying factors which raise the specter of impropriety can never be eradicated completely and still require careful judicial scrutiny.  
Kahn v. Tremont Corp.
, 694 A.2d 422, 428 (Del. 1997) (
Tremont
).  This rule "reflects the reality that in a transaction such as the one considered in this appeal [the sale of interest in a corporation], the controlling shareholder will continue to dominate the company regardless of the outcome of the transaction."  
Tremont
, 694 A.2d at 428.

Plaintiffs in the case 
sub
 
judice
 argue that summary judgment erroneously was entered and that the circuit court must conduct an entire fairness hearing because the FM majority engaged in a self-dealing transaction notwithstanding the fact that an independent committee was involved in the allocation process.  Plaintiffs contend there is more than enough evidence to raise an issue of material fact as to whether FMs either directly or indirectly exerted a controlling influence over the challenged transaction.
  Plaintiffs assert that the allocation distributes the CBOT's equity unevenly among the member groups and allows the FMs to abuse their control in order to take an inequitable portion of the equity for themselves.  Plaintiffs contend that, under Delaware law, the FMs' controlling shareholder status may be established by (1) exercising control over or dominating the business affairs of the corporation in general; (2) exercising control over the self-dealing transaction in question; or (3) constituting a majority as a group of shareholders.

The record reveals that the FMs clearly constitute a controlling majority in the foregoing circumstances.  
Sinclair
, 280 A.2d at 719-20.  Notwithstanding the fact that they are individual shareholders, when they exercise their votes with respect to issues affecting trading practices which impinge upon access to certain markets and procedures, those votes  principally benefit themselves and substantially exclude the other four member classes in matters such as trading in silver, access to CBOE, full Ceres transaction rights and the adoption of rules requiring certain products to be cleared only by FMs and not by AMs.
(footnote: 17) 
 U
nderstandably, the FMs collectively act to control the outcome to their own financial advantages.  Nothing in the record reveals the bases, formula, or specific methods used for evaluating these rights, although those rights were considered in the totality of share evaluation.  These trading rights and procedures from which the minority members are excluded increase the value of the ownership interests possessed by the FMs but are denied to the other classes.
(footnote: 18)
 Significantly, the record shows that the median market value of an FM seat during the period 1995 to 1999 was only 1.87 times greater than the median market value of an AM seat during the same period.  Further, testimony established that trading volume is one of the ingredients in determining share value; AM volume exceeds that of FMs; and minority members generated more than 60% of CBOT's volume total from 1997 to 2001.  Nevertheless, FMs would be allocated 5 shares for each AM share in the proposed CBOT, which adds to the question of fairness in light of the 1995 to 1999 median market values of CBOT seats and minority trading volume.

Added to the exclusions of full minority participation noted above is the troubling aspect of how the fixed ratio of shares to be distributed to the five members classes was determined.  The record shows that the William Blair analysts, whose opinion weighed in heavily with respect to this issue, merely produced a "range" and "round figure" of allocation ratios, from 4.5 to 1 to 5.25 to 1, and were unable to explain why the 5 to 1 ratio was adopted, nor how the ratio numbers making up the range were chosen. 

Without question, the FMs are entitled to greater equity than other member classes in the reconstituted, proposed CBOT.  How much more equity than that to be distributed to the minority, however, has not been demonstrated clearly and as a matter of law, as would justify entry of summary judgment in this case.  
Meadow v. Flavin
, 336 Ill. App. 3d 20, 28, 782 N.E.2d 733 (2002).  Accordingly, plaintiffs are entitled to an entire fairness hearing to determine by further evidence whether the allocation of equity interests among the membership classes is fair. 

The decision of the circuit court of Cook County to grant summary judgment in favor of defendants and against plaintiffs is  reversed and the cause remanded with instructions to conduct an entire fairness hearing in accordance with Delaware law.

Reversed and remanded with instructions.

THEIS, P.J., and KARNEZIS, J., concur.

FOOTNOTES
1:
Thereafter, defendants moved to compel arbitration and stay the proceedings, asserting that plaintiffs agreed, as a condition of becoming CBOT members or member interest holders, to submit all their disputes with other members arising out of the exchange business to arbitration under the CBOT's rules.  The circuit court sent the dispute to arbitration.  Upon interlocutory appeal, in 
Feldheim v. Sims
, 326 Ill. App. 3d 302, 313, 760 N.E.2d 123 (2001)
, this court reversed and remanded the circuit court's decision, ruling that defendants waived their right to arbitration by voluntarily participating in the litigation and not raising their right to arbitrate until after their motions for dismissal were denied.  

2:
The second and third amended complaints added a second count requesting relief solely for plaintiff Virginia McGathey.  Defendants moved to dismiss count II of both the second and third amended complaints.  The circuit court dismissed without prejudice count II of the second amended complaint, but the record does not show whether the court ruled with respect to count II of the third amended complaint.  Defendants claim that McGathey voluntarily dismissed count II of the third amended complaint but, again, no record evidence supports that claim.  

3:
James P. McMillin, a CBOT AM, testified by deposition that, as a member of the Implementation Committee, he understood, along with the other committee members, that FMs needed to be satisfied with the proposed restructuring in order for the restructuring to be approved.  

4:
Under CBOT Rule 162.05, the Board may appoint "Additional Committees" as it sees fit and prescribe the duties thereof.  The CBOT outside directors appointed to the Allocation Committee include (1) James R. Thompson, former Governor of Illinois; (2) Robert H. Michel, former Minority Leader of the United States House of Representatives; (3) Dr. Robert S. Hamada, Dean of the University of Chicago Graduate School of Business; (4) Ralph H. Weems, former President of the American Soybean Association; and (5) Andrew J. Filipowski. 

5:
In their principal brief, plaintiffs note that the importance of satisfying the FMs was highlighted early in the restructuring process, when FMs voiced concerns that their Chicago Board Options Exchange, Inc. (CBOE) exercise rights might be nullified by the restructuring.  The CBOE exercise rights allow only CBOT FMs to trade and vote at the CBOE and become regular members of the CBOE without purchasing a seat.  No CBOT minority members have the CBOE exercise right.  Plaintiffs claim that the exercise rights do not bring value to the CBOT because those using the exercise rights generate trading volume, revenue and liquidity at the CBOE, rather than the CBOT and, therefore, CBOT corporate funds, some of which came from minority members, should not have been used to litigate to ensure that FMs would retain the exercise right upon the CBOT's restructuring.  In their response to plaintiffs' first set of requests to admit, however, defendants denied that when the FMs exercise their CBOE exercise rights, they cannot use simultaneously the same full membership to trade CBOT contracts and stated that CBOT FMs who exercise their right to trade at the CBOE retain the ability to trade simultaneously CBOT contracts electronically.  In addition, CBOT FMs may exercise their right to trade at the CBOE and continue to trade contracts on the floor of the CBOT instead of trading at the CBOE.  

6:
According to McMillin, the Ceres Trading Limited Partner Interest (Ceres transaction) was initiated in 1990 when the CBOT began electronic trading.  The Ceres transaction, approved by the vote of CBOT members, was the method used to pass the value of electronic trading back to the membership, of which FMs possessed a 6 to 1 advantage in voting power.

7:
The sensitivity analysis, developed by Cotter, reported that "[b]y relinquishing a small percentage of control (both by class and by seat), it is possible to have an allocation that results in adoption by other classes, rather than dissatisfaction and possible delay in implementing a much needed reorganization and reinvigoration of this exchange."  In formulating the analysis, Cotter weighed members' and membership interest holders' liquidation rights, which also embodied voting rights and the Ceres transaction precedent, at 90%, seat market value at five percent and trading volume at five percent. 

8:
As previously described, the five factors considered in the allocation methodology include liquidation rights, voting rights, Ceres transaction precedent, seat market value and trading volume. 

9:
A letter from Worthington Brown to Governor Thompson, dated February 23, 2000, explains how voting rights were formulated at a 6 to 1 ratio between full and associate members.  In 1977, Brown was a member of the CBOT Long Range Planning Committee although he only recently had become an AM.  He suggested to the committee that AMs be allowed to vote.  A question was raised as to how much the vote should count.  Brown observed that, at the time, an FM seat was priced at $180,000 and an AM seat was $30,000.  Brown suggested a 6 to 1 ratio based on the seat prices and the measure was adopted.

10:
A spot price is a reflection of the most current, up-to-date, immediate pricing of the seat market value.

11:
Liquidation rights as between FMs and AMs are 6 to 1 and seat market prices are 1.87 to 1 for 1995 to 1999; 2.49 to 1 for 1999; and 3.99 to 1 for spot values.  

12:
According to the CBOT's restructuring report, in reaching its recommendation, the Allocation Committee considered a variety of factors in calculating its methodology and gave greater weight to liquidation rights, voting rights and Ceres Trading Limited Partner interest allocation of CBOT members, rather than the market values of CBOT seats prior to the announcement of the restructuring.  Similar to voting rights, AMs would receive one-sixth of the liquidation value that FMs would collect.  GIMs, COMs and IDEMs are entitled to less than AMs upon liquidation.  Likewise, minority members are entitled to a similar allocation for Ceres interests.  Liquidation and voting rights ratios that the Allocation Committee gave greater weight to in establishing its methodology already are reflected in the seat value market prices. 

13:
According to the CBOT's present amended and restated certificate of incorporation, FMs are entitled to one vote on all matters that are subject to a vote of the general membership, while AMs are entitled to one-sixth of one vote.  Holders of GIM, COM and IDEM membership interests do not have any voting rights.  As a result, FMs can outvote the minority by a margin of 1402 to 131 with respect to any matter that is put to a membership vote.  

14:
On an individual basis, the proposal would allocate shares in the proposed CBOT according to the following ratio: for each five shares allocated to each FM, AMs would receive one share, GIMs would receive 0.5 shares, COMs would receive 0.07 shares and IDEMs would receive 0.06 shares.   

15:
As examples of the FMs' voting domination, plaintiffs stated that only FMs have been elected as chairman and vice chairman of the CBOT Board, the CBOT's highest elected offices, because CBOT rules require that the chairman and vice chairman be FMs. Plaintiffs claim this is critical because the CBOT's policies are generated almost exclusively by the chairman.  According to plaintiffs, even the AMs who become Board members are selected by the FMs.  Pursuant to CBOT rules, the AMs do not elect the AM representatives on the Board, rather, a plurality of votes is necessary to elect AMs to Board positions.  CBOT rules provide that 11 out of the 18 Board members must be FMs.  As a result, plaintiffs assert the FMs, who control the voting mechanism, in effect, select the few AMs who are allowed on the Board.

16:
The 
Nixon
 court also stated, "[t]o hold that fairness necessarily requires precise equality is to beg the question:

Many scholars, though few courts, conclude that one aspect of fiduciary duty is the equal treatment of investors.  Their argument takes the following form: fiduciary principles require fair conduct; hence, fiduciary principles require equal treatment.  The conclusion does not follow.  The argument depends on an equivalence between 
equal
 and 
fair
 treatment.  To say that fiduciary principles require equal treatment is to beg the question whether investors would contract for equal or even unequal treatment."  
(Emphasis in original.)  626 A.2d at 1377, citing Frank H. Easterbrook and Daniel R. Fischel, 
The Economic Structure of Corporate Law
 110 (1991).

17:
Another example of FM self interest is a Board resolution requiring the CBOT to indemnify fully the FMs from all costs and expenses associated with this action.

18:
Little is revealed by the record as to when minority interest members purchased their seats in relation to the dates upon which trading rights, access to markets, transaction rights clearing rights and other limitations or advantages were created by FMs through their majority memberships on the Board and CBOT committees.