*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RONALD A. BROOKS, individually, and on behalf of W.B.H. Corp., a domestic corporation, | ) ) ) | Supreme Court No. S-15341 |
| | ) | Superior Court No. 4FA-11-01845 CI |
| Appellant, | ) ) | O P I N I O N |
| v. | ) ) | No. 6988 - March 13, 2015 |
| JOANN E. HORNER, individually, as officer and director of W.B.H. Corp., and as trustee and beneficiary of the GEORGE HORNER TRUST; the GEORGE HORNER TRUST; HELEN H. WARNER, individually and as officer and director of W.B.H. Corp.; and John Does 1-3, | ) ) ) ) ) ) ) ) | |
| Appellees. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances:  James M. Hackett, Law Office of James M. Hackett, Fairbanks, for Appellant.  James D. DeWitt and Gary A. Zipkin, Guess & Rudd, P.C., Fairbanks, for Appellees.

Before:  Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I.   INTRODUCTION

This case arises from a dispute over the sale of a corporate asset during the winding up of a closely held corporation. Two of the shareholders successfully bid to purchase the asset; the other shareholder claims they failed to overcome their conflict of interest and prove that the transaction was just and reasonable as to the corporation. Following trial, the superior court found in favor of the interested shareholders, in large part because the disinterested shareholder had voted to approve the transaction with full knowledge of the material facts. The disinterested shareholder appeals. We affirm, concluding that the superior court did not clearly err in its findings of fact or err in its application of Alaska law and the corporation's bylaws.

## II.   FACTS AND PROCEEDINGS

Ronald Brooks was a director and one-third shareholder of W.B.H. Corp., a closely held Alaska corporation formed in 1991. The other two shareholder-directors were Joann Horner and Helen Warner. At the times relevant to this lawsuit, the corporation's sole asset was a group of contiguous mining claims north of Fairbanks called Bittner Lode. Despite the parties' agreement to share costs equally, Horner and Warner for a number of years paid Brooks's share of the annual payments necessary to maintain the mineral leases.[1] By 2009 W.B.H. had no revenue, cash reserves of only $485, and accounts payable in excess of $85,000.

At the annual shareholders' meeting in December 2009, the three shareholders agreed that their best course was to dissolve the corporation and liquidate its sole asset. They discussed the corporation's debts and the anticipated costs of winding up, and they agreed that they would accept a minimum bid price of $100,000

---

[1]      Under AS 38.05.210-.212, W.B.H. was required to perform labor, pay rent, and pay royalties on all minerals mined from land subject to its claims.

for Bittner Lode. Horner and Warner proposed to set the bid deadline for March 31, 2010, but Brooks pushed for a June date instead, arguing that bidders would need time in good weather conditions to inspect the claims. Horner responded that a later sale would mean another year of upkeep costs for the cash-strapped corporation, and Brooks's motion failed to get a second. Brooks then voted with Horner and Warner to dissolve the corporation and appoint Horner "to supervise and direct the winding up process," on the condition, unanimously accepted, that Horner have discretion to extend the bid opening by 45 days. Brooks told Warner he was too busy to be involved in the dissolution.[2]

After the meeting Horner and Warner approached Donald Keill, a mining engineer, about undertaking an advertising campaign to market Bittner Lode. On Keill's advice Horner decided to use the corporation's remaining cash reserves to develop a sales brochure and a compact disc containing the most recent geological data on the area around Bittner Lode. Rather than advertise in mining periodicals, which they thought would be too costly for the likely return in exposure, Horner and Warner attended a series of mining conventions between January and March 2010, where they distributed copies of their brochure.

Meanwhile, John Burns, the corporation's attorney, drafted a confidentiality agreement and criteria for the submission of bids; these included a requirement that bidders show proof of financial pre-qualification by March 20, 2010, and a disclaimer

---

[2] Brooks denied saying this, but the superior court believed Warner's testimony that he did. We defer to the superior court's credibility finding. *See Riggs v. Coonradt*, 335 P.3d 1103, 1107 (Alaska 2014) (noting that "the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence" (internal quotation marks and citations omitted)).

of corporate liability for inaccuracies in the data on the compact disc. In February 2010 Horner and Warner reviewed and approved these terms and conditions.

By early March the marketing campaign had drawn interest from only one prospective bidder, Johannes Halbertsma, who ultimately decided not to bid. In late March Horner and Warner, fearing there would be no bids and anxious to complete the winding up process before enduring another year of upkeep costs, decided to submit their own bid. Their bid was $105,000 made in the name of the George Horner Trust/Helen Warner Joint Venture (JV), a joint venture they had created in the mid-1980s. Horner testified that she and Warner reached the $105,000 figure on the belief that it would satisfy all the corporation's liabilities, and they submitted a financial pre-qualification letter after the March 20 deadline but before the bid opening.

Horner called a meeting on April 2 at Burns's office for the bid opening. All three directors attended. Warner briefly described the efforts to market Bittner Lode; Horner then turned the meeting over to Burns, who opened the box where sealed bids were kept and revealed that there was only one bid, the JV's. Brooks moved that the bid be accepted. He raised no objection to the sale, despite Burns's caveat that it represented an apparent conflict of interest, and the directors voted unanimously to approve it. Horner and Warner presented a cashier's check for the full bid price immediately after the meeting, and within three days Warner prepared and signed draft minutes of the meeting.

Two months later, Brooks sent a letter to Horner and Warner in which he formally objected to the sale of Bittner Lode and demanded that they call a corporate meeting to reopen bidding; they did not do so. He brought suit individually and on behalf of W.B.H. to void the sale and re-convey Bittner Lode to the corporation. Brooks alleged that Horner and Warner breached their fiduciary duty to W.B.H. in the marketing

and sale of the mining claims, concealed and misrepresented facts material to the sale, and usurped a corporate opportunity.

Following a six-day bench trial, the superior court made extensive factual findings. It concluded that the sale of Bittner Lode was a conflict of interest but that Horner and Warner overcame it. It also found that Horner and Warner neither misrepresented the sale process nor breached their fiduciary duty to the corporation: the evidence failed to support Brooks's claims that they undervalued Bittner Lode, withheld information from him, or marketed the claims in a manner that would discourage bidding.

Brooks appeals. He argues that the sale is void under both AS 10.06.450(b) and AS 10.06.478(a) because (1) Horner and Warner did not disclose all the facts material to the sale; (2) Brooks lacked authority and adequate notice when he voted to approve it; and (3) the transaction, overall, was not just and reasonable.

## III. STANDARDS OF REVIEW

"We apply our independent judgment to any questions of law, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[3] Questions of interpretation of the meaning of written documents are questions of law unless there is conflicting evidence as to the parties' intent.[4] "We employ the clearly erroneous standard to review a lower court's factual findings."[5] We reverse factual findings "only

---

[3]    *Holmes v. Wolf*, 243 P.3d 584, 588 (Alaska 2010) (quoting *McCormick v. Reliance Ins. Co.*, 46 P.3d 1009, 1011-12 (Alaska 2002)).

[4]    *Sprucewood Inv. Corp. v. Alaska Hous. Fin. Corp.*, 33 P.3d 1156, 1161 (Alaska 2001).

[5]    *Harris v. AHTNA, Inc.*, 193 P.3d 300, 305 (Alaska 2008).

if we are left with a definite and firm conviction that a mistake has been made after considering the record as a whole."[6]

## IV. DISCUSSION

Horner and Warner were shareholders and directors when they bid on the corporation's single asset, Bittner Lode, and because of their fiduciary duty to the corporation and the other shareholder-director, they had the burden of proving that the transaction was fair.[7] For ordinary transactions, directors have the protection of the business judgment rule as long as they meet the standard of care set out in AS 10.06.450(b) — "the care . . . that an ordinarily prudent person in a like position would use under similar circumstances."[8] But as Brooks correctly points out, the law requires a higher standard when a transaction involves director self-interest.[9] This higher

---

[6]    *Id*.

[7]    *See Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 276 (Alaska 1980) ("The existence of a fiduciary duty between shareholders would justify careful scrutiny and shifting the burden onto the defendants to show that the transaction was fair." (citing 13 W. JAEGER, WILLISTON ON CONTRACTS § 1626A at 806-08 (3d ed. 1970))).

[8]    AS 10.06.450(b) requires a director to "perform the duties of a director . . . in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care, including reasonable inquiry, that an ordinarily prudent person in a like position would use under similar circumstances." *See also Henrichs v. Chugach Alaska Corp.*, 250 P.3d 531, 537 (Alaska 2011) ("The essence of [the business judgment] doctrine is that courts are reluctant to substitute their judgment for that of the board of directors unless the board's decisions are unreasonable." (quoting *Alaska Plastics*, 621 P.2d at 278)).

[9]    *See, e.g.*, *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 265 (2d Cir. 1984) (holding that "the business judgment rule governs only where the directors are not shown to have a self-interest in the transaction at issue," and that "[o]nce self-dealing . . . is demonstrated, the duty of loyalty supersedes the duty of care, and the burden shifts to the directors to prove that the transaction was fair and reasonable to the corporation"
(continued...)

standard is codified in AS 10.06.478(a), which requires a court to find that (1) "the material facts as to the transaction and as to the director's interest are fully disclosed or known to" the other directors; (2) the board nonetheless approves the transaction "in good faith," not counting the votes of the interested directors; and (3) "the person asserting the validity of the contract or transaction sustains the burden of proving that the contract or transaction was just and reasonable as to the corporation at the time it was authorized, approved, or ratified."[10] We agree with the superior court's conclusion that this standard was met in this case.[11]

A.  **The Superior Court Did Not Clearly Err In Finding That Brooks Had Knowledge Of All Facts Material To The Sale.**

The superior court found that Brooks "had knowledge of the material facts of the transaction before he moved to approve it and voted yes on his motion." The court found specifically that Brooks "was made aware of the bidding requirements" and the minimum bid price, which he in fact had voted to approve in December 2009; knew of the corporation's marketing efforts; "was aware of the general market climate"; and was

---

[9](...continued)
(internal quotation marks and citation omitted)).

[10]    AS 10.06.478(a)(2).

[11]    As a preliminary matter, we reject Brooks's apparent contention that the superior court clearly erred in deciding that the April meeting was a directors' meeting rather than a shareholders' meeting (though Brooks contends that the meeting was not valid however characterized). AS 10.06.478(a)(1) and (2) apply somewhat different standards for determining the propriety of self-interested transactions depending on whether it is shareholders or directors who approve them. Though there was evidence to the contrary, the superior court's decision that the April meeting was a directors' meeting was supported by Warner's contemporaneous characterization of it as such in the draft minutes and by the nature of the business conducted, which fell within the scope of the directors' dissolution activities. We see no clear error in this finding.

"charged with knowledge that as the only disinterested director, the law vested him with sole authority to approve or disapprove the sale of the lode by casting his vote."

Brooks argues on appeal that one other material fact was concealed from him: that the JV had not met the deadline for proving its financial pre-qualification. The bid submission criteria required that "[a]ll bidders must be prequalified by submitting verification of financial ability not later than March 20, 2010," but the JV submitted its pre-qualification letter on March 25, five days late.

Although Brooks addressed this issue in the superior court through his cross-examination of Burns, the corporation's attorney, he does not appear to have argued that it represented an omission of material fact. The superior court understandably did not include the JV's failure to meet the financial pre-qualification deadline among the allegations it analyzed. But even considering the issue,[12] we see no error in the superior court's conclusion that Brooks "had knowledge of the material facts" before voting to approve the transaction.

Burns testified that he selected March 20 as the deadline for financial pre-qualification arbitrarily, counting back from the bid deadline of March 31; that on March 25 he received the JV's financial pre-qualification letter from a bank confirming that it had funds available in the amount of its potential bid; and that as corporate counsel he independently confirmed that the letter satisfied the bid criteria and should be accepted. It is undisputed that the corporation had the letter in hand at the time the JV filed its bid (on the March 31 deadline) and before the bid opening, in time to satisfy the deadline's apparent purpose of assuring the directors that any bid under consideration was

---

[12]     Horner and Warner do not argue on appeal that Brooks has waived this point. Because it is fully briefed without objection, we exercise our discretion to address it. *See In re B.L.J.*, 717 P.2d 376, 381 n.5 (Alaska 1986) (considering issue not listed in points on appeal where "the issue has been briefed and the appellee and court are sufficiently informed of the matters in issue").

financially supported. The JV in fact *was* financially qualified to make the bid, as was conclusively demonstrated by its immediate payment by cashier's check following the bid opening. And Brooks was plainly not relying on the pre-qualification deadline; it is his position on appeal, in fact, that he did not know the deadline existed until after the sale process was over, and that in his view it was unrealistically early.

Brooks does not explicitly argue that he would have voted against the sale of Bittner Lode had he only known that the JV was late in filing its financial pre-qualification letter. He argues, however, that Burns's assurance to the directors that the JV met the bid criteria was nonetheless a material misrepresentation; that because of it Brooks was unaware of all the "material facts as to the transaction"; that his vote in favor of the transaction was not a fully informed one; and that Horner and Warner therefore failed to carry their burden of satisfying the first element of the test of AS 10.06.478(a).

But the missed deadline was material only if a reasonable director would have considered it important in deciding how to vote.[13] It is undisputed that the JV filed its financial pre-qualification letter before its bid, before the bid deadline, in time for Burns to verify it, and in time for the information to be useful to the board. It is undisputed that the JV was, in fact, financially qualified. And it is undisputed that the JV's bid exceeded the minimum bid and was, ultimately, the only bid the board could consider. Brooks has no convincing explanation as to why, under these circumstances, a reasonable director would have found it important that the JV had filed its financial pre-qualification letter five days after the deadline. We therefore reject his contention

---

[13]     *See Brown v. Ward*, 593 P.2d 247, 250 & n.6 (Alaska 1979) ("Federal authorities have established that a misrepresentation is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . Common law concepts of materiality are not in essence different." (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); RESTATEMENT (SECOND) OF TORTS § 538(2) (1977))).

that, as of the time he voted, he did not know "the *material* facts as to the transaction and as to the [other directors'] interest," as required by AS 10.06.478(a).[14]

## B. The Superior Court Did Not Clearly Err In Finding That The Board Approved The Sale In Good Faith By A Sufficient Vote.

Brooks does not dispute that he made the motion to accept the JV's bid at the April 2010 meeting and that he then, along with Horner and Warner, voted in favor of his motion.[15] For purposes of determining the transaction's validity, his is the only vote that counted.[16] He argues, however, that his vote was void because notice of the meeting was defective and because he lacked the authority to take actions in pursuance of the corporation's dissolution. We reject both these arguments.

### 1. Brooks waived notice by attending the directors' meeting.

Alaska Statute 10.06.470(b) provides that a "special meeting of the board . . . shall be held as provided in the bylaws or, in the absence of a bylaw provision, after either notice in writing sent 10 days before the meeting or notice by electronic means, personal messenger, or comparable person-to-person communication given at least 72 hours before the meeting." The W.B.H. bylaws provide that "[a]ttendance of a director at a meeting shall constitute waiver of notice of that meeting unless he attends for the express purpose of objecting to the transaction of business because the meeting

---

[14] Emphasis added.

[15] Brooks does not argue that Horner and Warner should have abstained from voting. We have held that "it is unworkable to require participants in closely-held businesses to disqualify their votes on matters involving self-interest." *Stevens ex rel. Park View Corp. v. Richardson*, 755 P.2d 389, 394 (Alaska 1986). "Decisions made in a small corporation often have a direct and immediate financial impact on many or all of the participants. Yet, it seems to us that that is not a sufficient ground for disqualifying their votes." *Id.* (footnote omitted).

[16] AS 10.06.478(a)(2) requires approval of the transaction at issue "by a sufficient vote without counting the vote of the interested director or directors."

has not been lawfully called or convened." Brooks contends that this provision is void because it conflicts with the notice requirement of AS 10.06.470(b). The statute, however, expressly allows corporations to adopt different procedures in their bylaws; besides, the bylaws' waiver provision closely follows a waiver provision in a later section of the statute. Alaska Statute 10.06.470(c) provides that "[n]otice of a meeting need not be given to a director . . . who attends the meeting without protesting before the meeting or at its commencement the lack of notice."

Brooks argues in the alternative that because the first sentence of the relevant W.B.H. bylaw allows directors to waive notice of special board meetings in writing, the second sentence — addressing waiver by attendance — must apply only to the regular annual meeting, not to a special meeting like the one called in April to review bids.[17] But under the bylaws, regular annual meetings do not require notice at all. The waiver provision can logically apply only to other meetings for which notice *is* ordinarily required. And allowing a director to waive notice of special meetings by attendance reflects the reality that such meetings — unlike the regular annual meeting — may need to be called on shortened time to address corporate issues as they arise.

In short, the W.B.H. bylaws allow waiver by attendance, the relevant statutes do not require something else, and the superior court did not clearly err when it found that Brooks waived notice of the April meeting by attending it without protest.

---

[17] The provision provides, in full:

> Section 5. <u>Waiver of Notice</u>. A director may waive in writing notice of a special meeting of the board either before or after the meeting; and his waiver shall be deemed the equivalent of giving notice. Attendance of a director at a meeting shall constitute waiver of notice of that meeting unless he attends for the express purpose of objecting to the transaction of business because the meeting has not been lawfully called or convened.

## 2. Brooks had authority to vote to approve the sale.

Brooks also argues that he lacked authority to approve the sale at the April 2010 meeting because it was a directors' meeting, and the board of directors lacks authority to "dissolve [the corporation] on its own initiative."[18] The superior court agreed that the April 2010 meeting was a directors' meeting, noting that Warner prepared and signed draft minutes of the meeting and labeled them as minutes of a special directors' meeting, and that opening and accepting bids — the stated purpose of the meeting — was part of the directors' oversight of the dissolution process.

But it was at the December 2009 shareholders' meeting that Brooks, Horner, and Warner had voted unanimously to dissolve the corporation and liquidate Bittner Lode.[19] Alaska Statute 10.06.615(b) provides that "[i]f a voluntary proceeding for winding up has commenced, the board shall continue to act as a board and has powers . . . to wind up and settle its affairs." Consistent with these facts in this legal framework, the superior court concluded that the board of directors was acting within its power "to wind up and settle its affairs" when Brooks, as a disinterested director, voted

---

[18] AS 10.06.605(b) lists only three exceptions in which the board of directors, rather than the shareholders, has authority to wind up and dissolve a corporation: "if the corporation has (1) been adjudicated bankrupt; (2) disposed of all of its assets and has not conducted any business for a period of five years immediately preceding the adoption of the resolution to dissolve the corporation; or (3) issued no shares." This case falls under none of these exceptions.

[19] AS 10.06.605(a) ("A corporation may elect voluntarily to wind up and dissolve by . . . the vote of shareholders taken at a special or annual meeting.").

to approve the JV's bid at the April 2010 meeting.[20]  We see no error in the superior court's decision of this issue.

C.  **The Superior Court Did Not Clearly Err In Deciding That The Sale Was Just And Reasonable.**

Finally, Brooks challenges the superior court's conclusion that Horner and Warner met their burden of proving the final element of the test under AS 10.06.478(a)(2):  that "the transaction was just and reasonable as to the corporation at the time it was authorized."  Brooks contends that Horner and Warner made unreasonable or bad faith decisions in their marketing campaign and that the superior court erred when it reviewed the reasonableness of the minimum bid price under the common law business judgment rule rather than the "entire fairness test" applicable to situations where a director's loyalty is in question.[21]  We are unpersuaded by these arguments.

We have never had occasion to explain what makes a self-interested transaction "just and reasonable" in a context like this one.  Most courts model their standard in such cases after Delaware's, which requires "the [self-interested] directors to prove that the bargain [was] at least as favorable to the corporation as they would have required if the deal had been made with strangers."[22]  This exacting standard has come

---

[20]    *See* AS 10.06.615(a) ("Voluntary proceedings for winding up the corporation commence upon the resolution of shareholders or directors of the corporation electing to wind up and dissolve, or upon the filing with the corporation of a written consent of the shareholders.").

[21]    *See, e.g.*, *Nixon v. Blackwell*, 626 A.2d 1366, 1375-76 (Del. 1993) (distinguishing the "entire fairness test" when a director's loyalty is in question from the business judgment rule, which protects decisions made under a director's duty of care).

[22]    *Gottlieb v. Heyden Chem. Corp.*, 90 A.2d 660, 663 (Del. 1952); *see, e.g.*, *Kim v. Grover C. Coors Trust*, 179 P.3d 86, 91 (Colo. App. 2007); *Feldheim v. Sims*, 800

(continued...)

to be known as the "entire fairness" test, and it "requires judicial scrutiny regarding both fair dealing and fair price."[23] Assuming without deciding that "just and reasonable" for purposes of AS 10.06.478(a)(2) requires the same level of proof as the "entire fairness" test, as Brooks contends it does,[24] we see no error in the superior court's conclusion that the transaction at issue here satisfied the statutory standard.

First, with regard to the JV's bid price of $105,000, the superior court pointed out that it is in excess of the minimum bid unanimously approved by the shareholders, including Brooks, in their December 2009 meeting, and that if the same bid had come from an otherwise-qualified third party instead of interested directors, the corporation "would have been legally obligated to sell for that price." Since the bid price

---

[22](...continued)
N.E.2d 410, 421-22 (Ill. App. 2003); *Cookies Food Prods., Inc. v. Rowedder*, 430 N.W.2d 447, 454 (Iowa 1988); *Becker v. Knoll*, 239 P.3d 830, 835 (Kan. 2010); *Demoulas v. Demoulas Super Markets, Inc.*, 677 N.E.2d 159, 180-81 (Mass. 1997); *Alpert v. 28 Williams St. Corp.*, 473 N.E.2d 19, 26-27 (N.Y. 1984); *Rock v. Rangos*, 61 A.3d 239, 255 (Pa. 2013); *Willard ex rel. Moneta Bldg. Supply, Inc. v. Moneta Bldg. Supply, Inc.*, 515 S.E.2d 277, 287 (Va. 1999).

[23] *See, e.g.*, *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) ("Regardless of where the burden lies, when a controlling shareholder stands on both sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness. . . ."); *Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 149 (Kan. 2003) ("The entire fairness standard is exacting and requires judicial scrutiny regarding both fair dealing and fair price." (internal quotation marks and citation omitted)).

[24] Brooks mistakenly contends that the superior court applied the business judgment rule to "the overall transaction" rather than a heightened standard implicated by Horner's and Warner's conflict of interest. The superior court applied the business judgment rule only to the shareholders' decision of the minimum bid price, addressed below. It properly analyzed the "overall transaction" in the context of the applicable conflict-of-interest statute, AS 10.06.478(a).

is no less favorable to the corporation than would have been required "if the deal had been made with strangers,"[25] the price was necessarily fair.

Nor do we fault the superior court for reviewing the shareholders' approval of a minimum bid price under the business judgment rule, by which "courts are reluctant to substitute their judgment for that of the board of directors unless the board's decisions are unreasonable."[26] Although the law does apply a different standard to director decisions involving a conflict of interest, the parties here decided on the minimum bid price at their December shareholders' meeting, well before Horner and Warner created the conflict by deciding to submit a self-interested bid.[27] To support his argument that the minimum bid price was unreasonable, Brooks points to trial testimony by the defendants' expert in evaluating mining claims, who concluded that "[t]he price of $100,000 would be considered a really good buy."[28] But it was undisputed that the corporation lacked the resources in 2010 for a reliable valuation of the claim and needed to sell the asset soon in order to wind up the corporation and pay off its debts. Under these circumstances, and in the absence of any evidence of an earlier conflict of interest, the superior court properly deferred to the judgment of the parties when together they

---

[25]     *Gottlieb*, 90 A.2d at 663.

[26]     *Henrichs v. Chugach Alaska Corp.*, 250 P.3d 531, 537 (Alaska 2011) (quoting *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 278 (Alaska 1980)); *see also Betz v. Chena Hot Springs Grp.*, 657 P.2d 831, 835 (Alaska 1982) (noting that "[a]bsent bad faith, breach of a fiduciary duty, or acts contrary to public policy, we will not interfere with . . . management decisions").

[27]     The superior court found credible Warner's testimony that she and Horner decided on March 30 that they would submit their bid.

[28]     Brooks's own expert, on the other hand, testified that no reasonable bidder would offer $100,000 for Bittner Lode without significantly more time for due diligence than the corporation was willing to provide.

decided, "as shareholders and directors," that $100,000 was the minimum bid their corporation would accept.

Brooks also challenges as unfair and unreasonable a number of steps in the marketing and bid process. He argues that Horner and Warner failed to market the property as agreed, preparing a "flawed sales brochure" instead of advertising in mining magazines. But as the superior court found, Brooks had agreed to delegate winding-up activities to Horner, informing Warner that he was too busy to be involved in them himself. It was undisputed that the corporation lacked the resources to do much more than it did. And more importantly, Brooks was fully aware of the marketing strategy pursued — and the limits of the market — when he voted to approve the sale of Bittner Lode to the JV.

Brooks also contends that the financial pre-qualification requirement, the corporation's disclaimer of liability for inaccuracies in the geological data, and the March 31, 2010 bid deadline were unreasonable because they discouraged potential bidders. Burns testified that the pre-qualification requirement and the disclaimer were intended to avert "phantom numbers that never would materialize" and the expenses that accompany buyer's remorse, thus limiting the field to serious bidders. While it is true that potential bidders might have wanted more time to inspect Bittner Lode, a later sale could have meant another year of upkeep costs which W.B.H. was in no condition to bear. And nothing in the testimony of Halbertsma, the single prospective bidder, suggested that any of the disputed bid conditions dissuaded him from submitting a bid, and there was no other evidence that the disputed conditions discouraged potential bidders. Having carefully weighed the marketing efforts and bid conditions against the corporation's need to liquidate its sole asset at minimal cost, the superior court did not clearly err in finding that the transaction was just and reasonable.

## V.    CONCLUSION

We AFFIRM the judgment of the superior court.